Filed 1/25/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| In re KENNETH HUMPHREY, on Habeas Corpus. | A152056 (San Francisco City and County Super. Ct. No. 17007715) |
| --- | --- |

Nearly forty years ago, during an earlier incarnation, the present Governor of this state declared in his State of the State Address that it was necessary for the Legislature to reform the bail system, which he said constituted an unfair "tax on poor people in California. Thousands and thousands of people languish in the jails of this state even though they have been convicted of no crime. Their only crime is that they cannot make the bail that our present law requires." Proposing that California move closer to the federal system, the Governor urged that we find "a way that more people who have not been found guilty and who can meet the proper standards can be put on a bail system that is as just and as fair as we can make it." (Governor Edmund G. Brown Jr., State of the State Address, Jan. 16, 1979.) The Legislature did not respond.

Undaunted, our Chief Justice, in her 2016 State of the Judiciary Address, told the Legislature it cannot continue to ignore "the question whether or not bail effectively serves its purpose, or does it in fact penalize the poor." Questioning whether money bail genuinely ensures public safety or assures arrestees appear in court, the Chief Justice suggested that better risk assessment programs would achieve the purposes of bail more fairly and effectively. (Chief Justice Tani Cantil-Sakauye, State of the Judiciary Address, Mar. 8, 2016.) The Chief Justice followed up her address to the Legislature by

establishing the Pretrial Detention Reform Workgroup in October 2016 to study the current system and develop recommendations for reform.[1]

This time the Legislature initiated action.  Senate Bill No. 10, the California Money Bail Reform Act of 2017, was introduced at the commencement of the current state legislative session.  The measure, still before the Legislature, opens with the declaration that "modernization of the pretrial system is urgently needed in California, where thousands of individuals held in county jails across the state have not been convicted of a crime and are awaiting trial simply because they cannot afford to post money bail or pay a commercial bail bond company."  We hope sensible reform is enacted, but if so it will not be in time to help resolve this case.

Meanwhile, as this case demonstrates, there now exists a significant disconnect between the stringent legal protections state and federal appellate courts have required for proceedings that may result in a deprivation of liberty and what **actually** happens in bail proceedings in our criminal courts.  As we will explain, although the prosecutor presented no evidence that non-monetary conditions of release could not sufficiently protect victim or public safety, and the trial court found petitioner suitable for release on bail, the court's order, by setting bail in an amount it was impossible for petitioner to pay, effectively constituted a *sub rosa* detention order lacking the due process protections

---

[1] The Workgroup's report concluded that "California's current pretrial release and detention system unnecessarily compromises victim and public safety because it bases a person's liberty on financial resources rather than the likelihood of future criminal behavior and exacerbates socioeconomic disparities and racial bias."  The substance of the report consists of 10 recommendations designed to establish and facilitate implementation of "a risk-based pretrial assessment and supervision system that (1) gathers individualized information so that courts can make release determinations based on whether a defendant poses a threat to public safety and is likely to  return to court— without regard for the defendant's financial situation; and (2) provides judges with release options that are effective, varied, and fair alternatives to money bail."  (Pretrial Detention Reform, Recommendations to the Chief Justice, Pretrial Detention Reform Workgroup (2017) p. 2.)

constitutionally required to attend such an order. Petitioner is entitled to a new bail hearing at which the court inquires into and determines his ability to pay, considers nonmonetary alternatives to money bail, and, if it determines petitioner is unable to afford the amount of bail the court finds necessary, follows the procedures and makes the findings necessary for a valid order of detention

## THE PARTIES' POSITION

Petitioner Kenneth Humphrey was detained prior to trial due to his financial inability to post bail. Claiming bail was set by the court without inquiry or findings concerning either his financial resources or the availability of a less restrictive non-monetary alternative condition or combination of conditions of release, petitioner maintains he was denied rights guaranteed by the Fourteenth Amendment.

Acknowledging that a bail scheme that "might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid" (*United States v. Salerno* (1987) 481 U.S. 739 at p. 745 (*Salerno*), petitioner does not claim California's money bail system is facially unconstitutional. However, he maintains that requiring money bail as a condition of pretrial release at an amount it is impossible for the defendant to pay is the functional equivalent of a pretrial detention order. (*United States v. Leathers* (D.C. Cir. 1969) 412 F.2d 169, 171, ["the setting of bond unreachable because of its amount would be tantamount to setting no conditions at all"]; *In re Christie* (2001) 92 Cal.App.4th 1105, 1109 ["the court may neither deny bail nor set it in a sum that is the functional equivalent of no bail"].) Because the liberty interest of an arrestee is a fundamental constitutional right entitled to heightened judicial protection (*id.* at p. 750), such an order can be constitutionally justified, petitioner says, only if the state "first establish[es] that it has a *compelling* interest which justifies the [order] and then demonstrate[s] that the [order is] *necessary* to further that purpose."[2] (*People v. Olivas*

---

[2] Whether a bail determination violates the due process and equal protection requirements at issue in this case is distinct from the question whether an unattainably

3

(1976) 17 Cal.3d 236 at p. 251, citing *Serrano v. Priest* (1971) 5 Cal.3d 584, 597; *In re Antazo* (1970) 3 Cal.3d 100, 110-111; *Westbrook v. Mihaly* (1970) 2 Cal.3d 765, 784-785.)  Petitioner argues that in order to do this, the state must show and the court must find that no condition or combination of conditions of release could satisfy the purposes of bail, which are to assure defendants' appearance at trial and protect victim and public safety.

As no such showing or finding was made, petitioner asks us to issue a writ of habeas corpus and either order his immediate release on his own recognizance or remand the matter to the superior court for an expedited hearing, with instructions to (1) conduct a detention hearing consistent with article I, section 12, of the California Constitution and the procedural safeguards discussed in *Salerno*, and; (2) set whatever least restrictive, non-monetary conditions of release will protect public safety; or (3) if necessary to assure his appearance at trial or future hearings, impose a financial condition of release after making inquiry into and findings concerning petitioner's ability to pay.

In his informal opposition to the petition the Attorney General asked us to deny the petition.  Relying upon the "Public Safety Bail" provisions of section 28, subd. (f)(3), of the California Constitution—which states that "[i]n setting, reducing or denying bail . . . .[p]ublic safety shall be the primary consideration"—the Attorney General distinguished the federal cases petitioner relies upon and argued that the magistrate did not violate petitioner's rights to due process or equal protection by deciding not to further reduce bail or release petitioner on his own recognizance.

However, after we issued an order to show cause, the Attorney General filed a return withdrawing his earlier assertion that the magistrate was not obligated to make any additional inquiry into petitioner's ability to pay under the circumstances of this case.

---

high money bail is also "excessive" under the state and federal Constitutions, as some courts have suggested.  (See, e.g., *Pugh v. Rainwater* (5th Cir. 1978) 572 F.2d 1053, 1057 [" '[b]ail set at a figure higher than an amount reasonably calculated to fulfill this purpose is "excessive" under the Eighth Amendment' "].)  Petitioner has not advanced this claim, however, and we therefore do not address it.

The Attorney General now agrees with petitioner that a writ of habeas corpus should issue for the purpose of providing petitioner with a new bail hearing.  As stated in the return:  "The Department of Justice has determined that it will not defend any application of the bail law that does not take into consideration a person's ability to pay, or alternative methods of ensuring a person's appearance at trial.  Given this determination, after further deliberations, we withdraw our earlier assertion that the magistrate was not obligated to make any additional inquiry into petitioner's ability to pay under the circumstances of this case."

We shall explain why we agree with the parties that the trial court erred in failing to inquire into petitioner's financial circumstances and less restrictive alternatives to money bail, and that a writ of habeas corpus should therefore issue for the purpose of providing petitioner a new bail hearing.

## FACTS AND PROCEEDINGS BELOW

### The Underlying Offenses

Petitioner, a retired shipyard laborer, is 63 years of age and a lifelong resident of San Francisco.  On May 23, 2017 (all dates are in that year), at approximately 5:43 p.m., San Francisco police officers responded to 1239 Turk Street regarding a robbery. The complaining witness, Elmer J., who was 79 years of age and used a walker, told the officers he was returning to his fourth floor apartment when a man, later identified as petitioner, followed him into his apartment and asked him about money.  At one point petitioner told Elmer to get on the bed and threatened to put a pillow case over his head. When Elmer said he had no money, petitioner took Elmer's cell phone and threw it onto the floor.  After Elmer gave him $2, petitioner stole $5 and a bottle of cologne and left. Elmer did not know or recognize petitioner.  While reviewing the surveillance video with front desk clerks, the officers were informed that the African-American person in the video was petitioner, who lived in an apartment on the third floor of the building.  The officers went to petitioner's apartment and arrested him without incident.  Petitioner was

subsequently charged with first degree robbery (Pen. Code, § 211),[3] first degree residential burglary (§ 459), inflicting injury (but not great bodily injury) on an elder and dependent adult (§ 368, subd. (c)), and theft from an elder or dependent adult, charged as a misdemeanor. (§ 368, subd. (d).)

*The Initial Setting of Bail*

At his arraignment on May 31, petitioner sought release on his own recognizance without financial conditions based on his advanced age, his community ties as a lifelong resident of San Francisco and his unemployment and financial condition, as well as the minimal property loss he was charged with having caused, the age of the three alleged priors (the most recent of which was in 1992), the absence of a criminal record of any sort for more than 14 years, and his never previously having failed to appear at a court ordered proceeding. Petitioner also invited the court to impose an appropriate stay-away order regarding the victim who, as noted, lived on a different floor of the same "senior home" in which appellant resided.

The prosecutor did not affirmatively argue for pretrial detention pursuant to article 1, section 12, of the California Constitution, but simply asked the court to "follow the PSA [Public Safety Assessment] recommendation, which is that release is not recommended," and requested bail in the amount of $600,000, as prescribed by the bail schedule, and a criminal protective order directing petitioner to stay away from the victim.

After indicating it had read the Public Safety Assessment Report on petitioner, the trial court stated as follows: "I appreciate the fact that Mr. Humphrey has had a lengthy history of contact here in the City and County of San Francisco. I also note counsel's argument that many of his convictions are older in nature; however, given the seriousness of this crime, the vulnerability of the victim, as well as the recommendation from pretrial

---

[3] All subsequent statutory references are to the Penal Code unless otherwise indicated. As will be noted, references to "section 12" and "section 28" are to sections 12 and 28 of article 1 of the California Constitution.

services, I'm not going to grant him OR [release on his own recognizance] or any kind of supervised release at this time. I will set bail in the amount of $600,000 and sign the criminal protective orders to [stay] away from [the victim]."[4]

***Petitioner's Motion for a Bail Hearing***

On July 10, petitioner filed a motion for a formal bail hearing pursuant to section 1270.2[5] and an order releasing him on his own recognizance or bail reduction, claiming that "bail, as presently set, is unreasonable and beyond the defendant's means" and "violates the Eighth Amendment's proscription against excessive bail."

Relying on *In re Christie, supra,* 92 Cal.App.4th at page 1109, which prohibits the setting of bail in an amount "that is the functional equivalent of no bail," and *Lopez-Valenzuela v. Arpaio* (9th Cir. 2014) 770 F.3d 772, 780-781, which discusses authority for the proposition that criteria warranting pretrial detention "satisfy substantive due process only if they are 'narrowly tailored to serve a compelling state interest,' " petitioner's bail motion argued that the substantive due process guarantee of the Fourteenth Amendment entitled him to an individualized determination of his right to be released prior to trial on his own recognizance or bail after he was afforded an opportunity to present evidence relating to any factors that might affect the court's decision whether to release him pending trial, and that his guilt may not be presumed during the bail-setting process.

The motion cited extensive statistical studies and other data showing racial disparities in bail determinations in adult criminal and juvenile delinquency proceedings

---

[4] At the request of defense counsel, the court modified the protective order by deleting the requirement that petitioner stay away from 1239 Turk Street, where petitioner and the victim both lived, and limiting the premises petitioner must stay away from to the fourth floor of the Turk Street address, where the victim lived.

[5] Section 1270.2 provides, as material, that "[w]hen a person is detained in custody on a criminal charge prior to conviction for want of bail, that person is entitled to an automatic review of the order fixing the amount of bail by the judge or magistrate having jurisdiction of the offense. That review shall be held not later than five days from the time of the original order fixing the amount of bail on the original accusatory pleading."

7

in state and federal courts in all regions of the country, none of which were challenged by the district attorney. A 2013 study of San Francisco's criminal justice system attached as an exhibit to petitioner's bail motion found, among other things, that although booked Black adults appear to be "more likely than booked White adults to meet the criteria for pretrial release," "Black adults in San Francisco are 11 times as likely as White adults to be booked into County Jail" prior to trial. (W. Hayward Burns Inst., *San Francisco Justice Reinvestment Initiative: Racial and Ethnic Disparities Analysis for the Reentry Council, Summary of Key Findings* (2013) p. 2.) The motion argued that "[t]he court should keep these stark facts in mind in setting bail so as not [to] exacerbate any unconscious, implicit or institutional bias that might exist."

The motion for a bail hearing also provided considerable information about petitioner's family and personal history, particularly the relationship between the murder of his father, with whom he was close, when petitioner was 16 years old, petitioner's turn to drugs and subsequent addiction, and his fitful but "life-long" efforts to deal with that problem. While in custody at the San Francisco County Jail from 2005 to 2008, petitioner successfully completed the Roads to Recovery drug rehabilitation program and earned a high school diploma. After he was released from jail petitioner enrolled for nearly two years in San Francisco City College as a participant in the Fresh Start program, and during that period served as mentor for young adults in the community. After serving in that role for seven months, petitioner suffered a relapse that ended his mentoring activities. Near the end of 2015, he voluntarily entered a program called 890 Men's Residential, which is administered by the HealthRIGHT 360 family of programs, a "behavioral health services agency that offers a streamlined continuum of comprehensive substance abuse and mental health services." Petitioner's bail motion included a copy of a letter from the HealthRIGHT program verifying that he had "successfully completed treatment on 5/19/2016."

Petitioner's motion also represented that after he committed the charged offenses he was accepted into the Golden Gate for Seniors program, which was administered by Community Awareness & Treatment Services, Inc. (CATS), "a non-profit organization

serving chronically homeless men and women in San Francisco with multiple problems including substance abuse and mental problems." Golden Gate for Seniors, CATS's oldest program, has 18 beds "that serve homeless men and women who abuse alcohol and drugs in the context of a six-month residential substance abuse treatment program [in which] clients participate in group recovery sessions, individual counseling and case management that link them with benefits, housing and other needed services." CATS accepted petitioner into the Golden Gate for Seniors program with a designated "intake date" of July 13, the day after the date set for the bail hearing. The motion argued that placing petitioner in this residential program instead of jail would ensure supervision and community safety, whereas placement in jail would deny him the opportunity to deal effectively with his substance abuse problem, which is the root of his past criminal conduct and the charged offenses.

***The Hearing on the Bail Motion***

The hearing on petitioner's bail motion took place on July 12, five days before the date set for the preliminary hearing. At the start of the proceeding defense counsel provided the court a letter from the Golden Gate for Seniors program stating that it had accepted petitioner for a residential placement commencing on July 13, the next day. After defense counsel said he had "laid out all my points in the bail motion" in detail, he emphasized that petitioner had not engaged in criminal conduct for many years, was 63 years of age, had been battling with addiction since he was a teenager, but had recently "made some significant strides," and that he took only five dollars and a bottle of cologne from his victim, who was not physically injured. Finally, counsel reiterated that though this was a "three-strikes" case, petitioner's prior convictions were very old, the most recent having occurred a quarter of a century ago, in 1992. For the foregoing reasons, defense counsel asked the court to release petitioner on his own recognizance, and failing that to be "OR'd to Golden Gate for Seniors."

The prosecutor pointed out that one of petitioner's priors was a felony for which he served a prison sentence, and that under section 1275, the court had to find unusual circumstances in order to deviate from the bail schedule. Asserting that there were no

9

such circumstances, and the $600,000 previously imposed by the court was the scheduled amount of bail, the prosecutor urged the court not to reduce that amount. Arguing that petitioner's present and past criminal offenses were all committed due to the need to "feed his habit," the prosecutor maintained that his addiction and inability to address it constituted "a continued public safety risk." The prosecutor added that petitioner should be considered "a great public safety risk" because he "followed a disabled senior into his home. He stole from him. He did so in a building that he had access to, [t]hat he resided in." Finally, the prosecutor argued that petitioner was a flight risk because he was exposed to a lengthy prison sentence.

The one-page form risk assessment report submitted to the court by the pretrial services agency, which does not indicate a representative of the agency ever met with petitioner, provides no individualized explanation of its opaque risk assessment of petitioner and no information regarding the availability and potential for use of an unsecured bond, which imposes no costs on the defendant who appears in court, or supervised release programs involving features like required daily or periodic check-ins with the pretrial services agency, drug testing, home detention, electronic monitoring,[6] or other less restrictive release options. Nor, so far as the record shows, did the court ask the pretrial services agency to provide any such information.

In explaining its decision, the trial court stated that it had public safety concerns because "this was a serious crime and serious conduct involved and pretty extreme tactics

---

[6] The number of accused and convicted criminals in the United States who are monitored with ankle bracelets and other electronic tracking devices, such as GPS and radio-frequency units, rose nearly 140 percent over 10 years, according to a survey conducted in 2015 by The Pew Charitable Trusts. More than 125,000 people were supervised with the devices in 2015, up from 53,000 in 2005. (Use of Electronic Offender-Tracking Devices Expands Sharply, Brief from the Pew Charitable Trusts (Sept. 2016). Available at <http://www.pewtrusts.org/en/research-and-analysis/issue-briefs/2016/09/use-of-electronic-offender-tracking-devices-expands-sharply> [as of Jan. 25, 2018]; Eisenberg, *Mass Monitoring* ( 2017) 90 So. Cal. L.Rev. 123; Wiseman, *Pretrial Detention and the Right to be Monitored* (2014) 123 Yale L.J. 1344; Causey, *Reviving the Carefully Limited Exception: From Jail to GPS Bail* (2013) 5 Faulkner L.Rev. 59.)

employed by Mr. Humphrey, if I accept what is in the police report,"[7] noting also that his offenses were similar to those he had committed in the past, "so that continuity is troubling to the court." The court acknowledged that "maybe little was taken," but said "that's because the person whose home was invaded was poor [and] I'm not [going to] provide less protection to the poor than to the rich." The court also felt petitioner's criminal history and the circumstances of the offenses, which the court described as "basically a home invasion," "are captured in the scheduled bail of $600,000. And as [the district attorney] argued, I have to find unusual circumstances to deviate. However, the court was impressed with petitioner's "willingness to participate in treatment, and I do commend that. I cannot see my way to an OR release on that basis, but I do think that is an unusual circumstance that would justify some deviation from the bail schedule." The court also attached significance to petitioner's strong ties to the community, and found that factor also qualified as an unusual circumstance justifying deviation from the bail schedule. Nonetheless, the court believed a high bail was still warranted "because of public safety and flight risk concerns," "and so I'm [going to] modify bail to be $350,000." At no point during the hearing did the court note that, as indicated in the risk assessment report and emphasized by counsel, petitioner had never previously failed to appear at a court ordered hearing.

When the court added an additional condition—that upon release on bail petitioner participate in the Golden Gate for Seniors residential drug treatment program—the public defender observed that petitioner was too poor "to make even $350,000 bail" and would therefore have to remain in custody pending trial and be unable to participate in a residential drug treatment program. The court did not comment on the anomalousness of imposing a condition of release that it made impossible for petitioner to satisfy by setting bail at an unattainable figure.

---

[7] The police report was not made a part of the appellate record and the trial court did not at the arraignment or subsequent bail hearing identify the statements in the report it apparently relied upon.

11

The petition for writ of habeas corpus was filed in this court on August 4, at which time petitioner was in custody. We issued an order to show cause on September 1.

## DISCUSSION

"Habeas corpus is an appropriate vehicle by which to raise questions concerning the legality of bail grants or deprivations. [Citations.] In evaluating petitioner's contentions, this court may grant relief without an evidentiary hearing if the return admits allegations in the petition that, if true, justify relief. [Citations.] On the other hand, we may deny the petition, without an evidentiary hearing, if we are persuaded the contentions in the petition are without merit. [Citations.]" (*In re McSherry* (2003) 112 Cal.App.4th 856, 859-860.)

Where, as here, the material facts of the case are undisputed and " 'the application of law to fact is predominantly legal, such as when it implicates constitutional rights and the exercise of judgment about the values underlying legal principles, [the appellate] court's review is de novo.' " (*In re Taylor* (2015) 60 Cal.4th 1019, 1035, quoting *In re Collins* (2001) 86 Cal.App.4th 1176, 1181.)

Petitioner's claims that he was denied due process of law and deprived of his personal liberty on the basis of poverty arise under the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution and article 1, section 7 of the California Constitution.

### I.

### *The California Bail Process*

As noted, the California Constitution contains two sections pertaining to bail: sections 12 and 28 of article I (hereafter section 12 and section 28).

Section 12, like the preceding bail provisions of the California Constitution,[8] "was intended to abrogate the common law rule that bail was a matter of judicial discretion by

---

[8] The prior bail provision, which immediately prior to 1974 was article I, section 6, stated that: "All persons shall be bailable by sufficient sureties, unless for capital offenses, when the proof is evident, or the presumption great." This identical provision

12

conferring an absolute right to bail except in a narrow class of cases." (*In re Law* (1973) 10 Cal.3d 21, 25, citing *In re Underwood* (1973) 9 Cal.3d 345 and *Ex parte Voll, supra,* 41 Cal. at p. 32.) The provision "establishes a person's right to obtain release on bail from pretrial custody, identifies certain categories of crime in which such bail is unavailable, prohibits the imposition of excessive bail as to other crimes, sets forth the factors a court shall take into consideration in fixing the amount of the required bail, and recognizes that a person 'may be released on his or her own recognizance in the court's discretion." (*In re York* (1995) 9 Cal.4th 1133, 1139-1140, fn. omitted)[9]

Subsections (b) and (c) of section 12 provide that a court cannot deny admission to bail to a defendant charged with violent acts or who threatened another with great bodily harm, except on the basis of "clear and convincing evidence" that there is "a substantial likelihood the defendant's release would result in great bodily harm to others." The factors the court must consider in setting the amount of bail are "the seriousness of the

---

was previously contained in article I, section 7, of the California Constitution. (*Ex parte Voll* (1871) 41 Cal. 29, 31; see also *Ex Parte Duncan* (1879) 54 Cal. 75.)

[9] Section 12 provides in full:

"A person shall be released on bail by sufficient sureties, except for:

(a) Capital crimes when the facts are evident or the presumption great;

(b) Felony offenses involving acts of violence on another person, or felony sexual assault offenses on another person, when the facts are evident or the presumption great and the court finds based upon clear and convincing evidence that there is a substantial likelihood the person's release would result in great bodily harm to others; or

(c) Felony offenses when the facts are evident or the presumption great and the court finds based on clear and convincing evidence that the person has threatened another with great bodily harm and that there is a substantial likelihood that the person would carry out the threat if released.

Excessive bail may not be required. In fixing the amount of bail, the court shall take into consideration the seriousness of the offense charged, the previous criminal record of the defendant, and the probability of his or her appearing at the trial or hearing of the case.

A person may be released on his or her own recognizance in the court's discretion."

offense charged, the previous criminal record of the defendant, and the probability of his or her appearing at the trial or hearing of the case." (§ 12.)

Section 28 establishes and ensures enforcement of 17 rights for victims of criminal acts (art. I, § 28, subds. (f)(1)-(13)), one of which is the right "[t]o have the safety of the victim and the victim's family considered in fixing the amount of bail and release conditions for the defendant." (Art. I, § 28, subd. (b)(3).) With respect to that victim's right, subdivision (f)(3) of section 28, entitled "Public Safety Bail," provides that "[i]n setting, reducing or denying bail, the judge or magistrate shall take into consideration the protection of the public, the safety of the victim, the seriousness of the offense charged, the previous criminal record of the defendant, and the probability of his or her appearing at the trial or hearing of the case. Public safety and the safety of the victim shall be the primary consideration."

The statutes implementing the constitutional right to bail are set forth in title 10, chapter 1 of the Penal Code. (§§ 1268–1276.5.) Under the statutory scheme, a defendant charged with an offense not punishable with death "may be admitted to bail before conviction, as a matter of right," and "[t]he finding of an indictment does not add to the strength of the proof or the presumptions to be drawn therefrom." (§§ 1270.5, 1271.) However, before any person arrested for any specified serious offense may be released on bail in an amount that is either more or less than the amount contained in the schedule of bail for that offense, or may be released on his or her own recognizance, a hearing must be held at which "the court shall consider evidence of past court appearances of the detained person, the maximum potential sentence that could be imposed, and the danger that may be posed to other persons if the detained person is released." (§ 1270.1, subds. (a) & (c).) In determining whether to release the detained person on his or her own recognizance, "the court shall consider the potential danger to other persons, including threats that have been made by the detained person and any past acts of violence. The court shall also consider any evidence offered by the detained person regarding his or her ties to the community and his or her ability to post bond." (§ 1270.1, subd. (c).) Where bond is set in a different amount from that specified in the bail schedule, "the judge or

14

magistrate shall state the reasons for that decision and shall address the issue of threats made against the victim or witness, if they were made, in the record." (§ 1270.1, subd. (d).)

A person detained in custody prior to conviction for want of bail is entitled, no later than five days from the time of the original order fixing bail, to an automatic review of the order fixing the amount of bail on the original accusatory pleading. (§ 1270.2)

Section 1275, which describes the factors judicial officers are obliged to consider in making bail determinations, tracks the exact language of subdivision (f)(3) of section 28 in declaring that "[i]n setting, reducing, or denying bail, a judge or magistrate shall take into consideration the protection of the public, the seriousness of the offense charged, the previous criminal record of the defendant, and the probability of his or her appearing at trial or at a hearing of the case. The public safety shall be the primary consideration." (§ 1275, subd. (a)(1).) Section 1275 additionally states that "[i]n considering the seriousness of the offense charged, a judge or magistrate shall include consideration of the alleged injury to the victim, and alleged threats to the victim or a witness to the crime charged, the alleged use of a firearm . . . or possession of controlled substances by the defendant." (§ 1275, subd. (a)(2).) Before a court reduces bail to below the amount established by the applicable bail schedule for specified serious offenses "the court shall make a finding of unusual circumstances and shall set forth those facts in the record." (§ 1275, subd. (c).)

The only requirement in the bail statutes that a court considering imposition of money bail take into account the defendant's financial circumstances is that the court consider "any evidence offered by the detained person" regarding ability to post bond. (§ 1270.1, subd. (c).) Nothing in the statutes requires the court to consider less restrictive conditions as alternatives to money bail.

In the present case, the parties agree that the district attorney did not produce "clear and convincing evidence" that there is "a substantial likelihood" petitioner's release "would result in great bodily injury to others" or that petitioner "threatened another with great bodily harm" and "there is a substantial likelihood" he "would carry

15

out the threat if released," as required for detention under section 12, and the court did not make such findings. The parties further agree that, as we next explain, the due process and equal protection clauses of the Fourteenth Amendment require the court to make two additional inquiries and findings before ordering release conditioned on the posting of money bail—whether the defendant has the financial ability to pay the amount of bail ordered and, if not, whether less restrictive conditions of bail are adequate to serve the government's interests—and the trial court failed to make either of these inquiries or findings.

## II.

### *The Court Erred in Failing to Inquire Into and Make Findings Regarding Petitioner's Financial Ability to Pay Bail and Less Restrictive Alternatives to Money Bail*

Petitioner's claim that the due process and equal protection clauses of the Fourteenth Amendment required the trial court to determine the availability of less restrictive non-monetary conditions of release that would achieve the purposes of bail is based on two related lines of cases.

The first, exemplified by *Bearden v. Georgia* (1983) 461 U.S. 660 (*Bearden*), does not relate to bail directly but more generally to the treatment of indigency in cases in which a defendant is exposed to confinement as a result of his or her financial inability to pay a fine or restitution. These cases establish that a defendant may not be imprisoned solely because he or she is unable to make a payment that would allow a wealthier defendant to avoid imprisonment. In the second line are bail cases, primarily *Salerno, supra,* 481 U.S. 739, establishing that, because the liberty interest of a presumptively innocent arrestee rises to the level of a fundamental constitutional right, the right to bail cannot be abridged except through a judicial process that safeguards the due process rights of the defendant and results in a finding that no less restrictive condition or combination of conditions can adequately assure the arrestee's appearance in court and/or protect public safety, thereby demonstrating a compelling state interest warranting abridgment of an arrestee's liberty prior to trial.

As we shall describe, the principles underlying these cases dictate that a court may not order pretrial detention unless it finds either that the defendant has the financial ability but failed to pay the amount of bail the court finds reasonably necessary to ensure his or her appearance at future court proceedings; or that the defendant is unable to pay that amount and no less restrictive conditions of release would be sufficient to reasonably assure such appearance; or that no less restrictive nonfinancial conditions of release would be sufficient to protect the victim and community.

**A.**

The question in *Bearden, supra,* 461 U.S. 660, was whether the Fourteenth Amendment prohibits a state from revoking an indigent defendant's probation for failure to pay a fine and restitution. The court held that the trial court erred in automatically revoking probation on the basis that the petitioner could not pay the fine imposed without determining that he had not made sufficient bona fide efforts to pay or that adequate alternate forms of punishment did not exist. In reaching this result, Justice O'Connor noted that "[d]ue process and equal protection principles converge" in the Supreme Court's analysis in cases involving the treatment of indigents in the criminal justice system, but the court "generally analyze[d] the fairness of relations between the criminal defendant and the State under the Due Process Clause, while we approach the question whether the State has invidiously denied one class of defendants a substantial benefit available to another class of defendants under the Equal Protection Clause." (*Id.* at p. 665, citing *Ross v. Moffit* (1974) 417 U.S. 600, 608-609.)

Justice O'Connor pointed out, however, that in order to determine whether the differential treatment violates the equal protection clause, "one must determine whether, and under what circumstances, a defendant's indigent status may be considered in the decision whether to revoke probation. This is substantially similar to asking directly the due process question of whether and when it is fundamentally unfair or arbitrary for the State to revoke probation when an indigent is unable to pay the fine. Whether analyzed in terms of equal protection or due process, the issue cannot be resolved by resort to easy slogans or pigeonhole analysis, but rather requires a careful inquiry into such factors as

17

'the nature of the individual interest affected, the extent to which it is affected, the rationality of the connection between legislative means and purpose, [and] the existence of alternative means for effectuating the purpose . . . .' " (*Ross v. Moffit*, *supra*, 417 U.S. at pp. 666-667, fns. omitted.)[10]

In imposing a judicial responsibility to inquire into the financial circumstances of an allegedly indigent defendant, the *Bearden* court relied heavily on the reasoning of its earlier opinions in *Williams v. Illinois* (1970) 399 U.S. 235 (*Williams*) and *Tate v. Short* (1971) 401 U.S. 395 (*Tate*), both of which advanced the process of mitigating the disparate treatment of indigents in the criminal justice system initially set in motion by *Griffin v. Illinois* (1956) 351 U.S. 12 and *Douglas v. California* (1963) 372 U.S. 353.

In *Williams* the indigent defendant was convicted of petty theft and given the maximum possible sentence of one year imprisonment and a $500 fine. As permitted under an Illinois statute, the judgment directed that in the event of nonpayment of the fine, the defendant was to remain in jail to pay off the obligation at the rate of five dollars per day. The Supreme Court struck the statute as applied to the defendant, holding that "once the State has defined the outer limits of incarceration necessary to satisfy its penological interests and policies, it may not then subject a certain class of convicted defendants to a period of imprisonment beyond the statutory maximum solely by reason of their indigency." (*Williams, supra*, 399 U.S. at pp. 241-242.) *Tate* was a similar case except that the statutory penalty permitted only a fine.

---

[10] In a footnote, Justice O'Connor pointed out that "[a] due process approach has the advantage in this context of directly confronting the intertwined question of the role that a defendant's financial background can play in determining an appropriate sentence. When the court is initially considering what sentence to impose, a defendant's financial resources is a point on a spectrum rather than a classification. Since indigency in this context is a relative term rather than a classification, fitting 'the problem of this case into an equal protection framework is a task too Procrustean to be rationally accomplished.' [Citation.] The more appropriate question is whether consideration of a defendant's financial background in setting or resetting a sentence is so arbitrary or unfair as to be a denial of due process." (*Bearden, supra*, 461 U.S. at p. 666, fn. 8.) That statement is as applicable to a bail determination as to the sentencing issue in *Bearden*.

As stated in *Williams*, "On its face the statute extends to all defendants an apparently equal opportunity for limiting confinement to the statutory maximum by satisfying a money judgment. In fact, this is an illusory choice for Williams or any indigent who, by definition, is without funds. Since only a convicted person with access to funds can avoid the increased imprisonment, the Illinois statute in operative effect exposes only indigents to the risk of imprisonment beyond the statutory maximum. By making the maximum confinement contingent upon one's ability to pay, the State has visited different consequences on two categories of persons since the result is to make incarceration in excess of the statutory maximum applicable only to those without the requisite resources to satisfy the money portion of the judgment." (*Williams, supra*, 399 U.S. at pp. 241-242, fns. omitted, accord, *Tate, supra,* 401 U.S. at pp. 398-399.)

The rule the *Bearden* court distilled from *Williams* and *Tate* is that the state "cannot ' "[impose] a fine as a sentence and then automatically [convert] it into a jail term solely because the defendant is indigent and cannot forthwith pay the fine in full." ' [(*Tate, supra,* 401 U.S. at p. 398.)] In other words, if the State determines a fine or restitution to be the appropriate and adequate penalty for the crime, it may not thereafter imprison a person solely because he lacked the resources to pay it. Both *Williams* and *Tate* carefully distinguished this substantive limitation on the imprisonment of indigents from the situation where a defendant was at fault in failing to pay the fine." (*Bearden, supra*, 461 U.S. at pp. 667-668.)

As *Bearden* explained, the Fourteenth Amendment ameliorates, even if it does not cure, the differential treatment it protects against by mandating careful and consequential judicial inquiry into the circumstances. A probationer who willfully refuses to pay a fine or restitution despite having the means to do so, or one who fails to "make sufficient bona fide efforts to seek employment or borrow money in order to pay the fine or restitution," may be imprisoned as a "sanction to enforce collection" or "appropriate penalty for the offense." (*Bearden, supra,* 461 U.S. at p. 668.) "But if the probationer has made all reasonable efforts to pay the fine or restitution, and yet cannot do so through no fault of his own, it is fundamentally unfair to revoke probation automatically without considering

19

whether adequate alternative methods of punishing the defendant are available." (*Id.* at pp. 668-669.)

Bearden, of course, was dealing with the issue of inability to pay in the context of individuals already convicted and sentenced. Because it was concerned with fines and restitution, the *Bearden* court discussed the measures necessary to satisfy the State's interests in punishment and deterrence. The issues are different in the pretrial bail context. Here the relevant governmental interests are ensuring a defendant's presence at future court proceedings and protecting the safety of victims and the community. The liberty interest of the defendant, who is presumed innocent, is even greater; consequently, as will be further explained, it is particularly important that his or her liberty be abridged only to the degree necessary to serve a compelling governmental interest. (See *Lopez-Valenzuela v. Arpaio, supra,* 770 F.3d at p. 779; *Salerno, supra,* 481 U.S. at pp. 749-750, 755.) When money bail is imposed to prevent flight, the connection between the condition attached to the defendant's release and the governmental interest at stake is obvious: If the defendant fails to appear, the bail is forfeited. (§§ 1269b, subd. (h); 1305, subd. (a).) A defendant who is unable to pay the amount of bail ordered—assuming appropriate inquiry and findings as to the amount necessary to protect against flight—is detained because there is no less restrictive alternative to satisfy the governmental interest in ensuring the defendant's presence. (See *United States v. Mantecon-Zayas* (1st Cir. 1991) 949 F.2d 548, 550; *Brangan v. Commonwealth* (Mass. 2017) 80 N.E.3d 949, 960, 963.)[11] Money bail, however, has no logical connection to protection of the public, as

---

[11] *United States v. Mantecon-Zayas, supra,* 949 F.2d at p. 550, held that a court may impose a financial condition the defendant cannot meet *if* the court finds such condition bail is reasonably necessary to ensure the defendant's presence at trial. But "once a court finds itself in this situation—insisting on terms in a 'release' order that will cause the defendant to be detained pending trial—it must satisfy the procedural requirements for a valid *detention* order; in particular, the requirement in 18 U.S.C. § 3142(i) that the court 'include written findings of fact and a written statement of the reasons for the detention.' " (*Ibid.*) To the same effect, *Brangan v. Commonwealth, supra,* 80 N.E.3d at page 963, held that although a defendant does not have a right to "affordable bail," "where a judge sets bail in an amount so far beyond a defendant's

bail is not forfeited upon commission of additional crimes. Money bail will protect the public only as an incidental effect of the defendant being detained due to his or her inability to pay, and this effect will not consistently serve a protective purpose, as a wealthy defendant will be released despite his or her dangerousness while an indigent defendant who poses minimal risk of harm to others will be jailed. Accordingly, when the court's concern is protection of the public rather than flight, imposition of money bail in an amount exceeding the defendant's ability to pay unjustifiably relieves the court of the obligation to inquire whether less restrictive alternatives to detention could adequately protect public or victim safety and, if necessary, explain the reasons detention is required.

*Bearden* and its progeny " 'stand for the general proposition that when a person's freedom from governmental detention is conditioned on payment of a monetary sum, courts must consider the person's financial situation and alternative conditions of release when calculating what the person must pay to satisfy a particular state interest.' Otherwise, the government has no way of knowing if the detention that results from failing to post a bond in the required amount is reasonably related to achieving that interest." (*Hernandez v. Sessions* (9th Cir. 2017) 872 F.3d 976, 992-993.)

The principles enunciated in *Bearden*, *Williams,* and *Tate* have been rigorously enforced by the courts of this state.

In *In re Antazo, supra,* 3 Cal.3d 100, the two defendants were convicted of arson, and the trial court suspended imposition of sentence upon the condition, among others, that each pay a fine of $2,500 plus a penalty assessment of $625 or, in lieu of payment, serve one day in jail for each $10 unpaid. One defendant paid the fine and assessment and was released. The other defendant, Antazo, was indigent and unable to pay, and was therefore incarcerated. Discharging Antazo from custody, the Supreme Court stated as

---

ability to pay that it is likely to result in long-term pretrial detention, it is the functional equivalent of an order for pretrial detention, and the judge's decision must be evaluated in light of the same due process requirements applicable to such a deprivation of liberty."

21

follows: "[A] sentence to pay a fine, together with a direction that a defendant be imprisoned until the fine is satisfied, gives an advantage to the rich defendant which is in reality denied to the poor one. 'The "choice" of paying $100 fine or spending 30 days in jail is really no choice at all to the person who cannot raise $100. The resulting imprisonment is no more or no less than imprisonment for being poor . . . .' To put it in another way and in the context of the present case, when a fine in the same amount is imposed upon codefendants deemed equally culpable with the added provision for their imprisonment in the event of its nonpayment, an option is given to the rich defendant but denied to the poor one." (*Id.* at p. 108; accord, *Charles S. v. Superior Court* (1982) 32 Cal.3d 741, 750.)

The court of appeal adopted the same reasoning in *In re Young* (1973) 32 Cal.App.3d 68, in which the petitioner challenged the denial of prison credit for presentence detention that resulted solely from his indigency. The court held that as applied to an indigent defendant who could not afford bail, a statute providing that a prison term commences on delivery of the defendant to prison "operates to create an unconstitutional discrimination and results in overall confinement of persons who are convicted of the same crime who are able to afford bail and so secure liberty and those who cannot do so and are confined. Although the presentence jail time may not be 'punishment' as defined by the Penal Code, it is a deprivation of liberty. The additional deprivation suffered only by the indigent does not meet federal standards of equal protection . . . ." (*Id.* at p. 75; accord, *People v. Kay* (1973) 36 Cal.App.3d 759, 763 [holding that "[a]n indigent defendant cannot be imprisoned because of his inability to pay a fine, even though the fine be imposed as a condition of probation" and instructing the trial court on remand to take into consideration the "present resources of appellants and . . . their prospects" when determining their restitution payments].)

Turning to the present case, petitioner asserts and it is undisputed that he was detained prior to trial due to his financial inability to post bail in the amount of $350,000, an amount that was fixed by the court without consideration of either his financial circumstances or less restrictive alternative conditions of release. The court's error in

22

failing to consider those factors eliminated the requisite connection between the amount of bail fixed and the dual purposes of bail, assuring petitioner's appearance and protecting public safety. (*Pugh v. Rainwater, supra*, 572 F.2d at p. 1057 [" 'Since the function of bail is limited, the fixing of bail for any individual defendant must be based upon standards relevant to the purpose of assuring the presence of that defendant.' "].) Due to its failure to make these inquiries, the trial court did not know whether the $350,000 obligation it imposed would serve the legitimate purposes of bail or impermissibly punish petitioner for his poverty. "[W]hen the government detains someone based on his or her failure to satisfy a financial obligation, the government cannot reasonably determine if the detention is advancing its purported governmental purpose unless it first considers the individual's financial circumstances and alternative ways of accomplishing its purpose." (*Hernandez v. Sessions, supra*, 872 F.3d at p. 991.)

**B.**

*Salerno, supra*, 481 U.S. 739, which petitioner relies heavily upon, upheld the constitutionality of the federal Bail Reform Act of 1984 (18 U.S.C. § 3141 et seq.) (the Bail Reform Act). That Act provides that "[a] judicial officer . . . before whom an arrested person is brought shall order that such person be released or detained, pending judicial proceedings" (18 U.S. C. § 3141(a)) and that the judicial officer "shall order the pretrial release of the person on personal recognizance, or upon execution of an unsecured appearance bond in an amount specified by the court," subject to specified conditions, "unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." (18 U.S.C. § 3142(b).) Thus, if the offense is not made statutorily unbailable, the presumption is release pending trial.[12]

---

[12] The Bail Reform Act, and the District of Columbia bail statutes (Dist. of Col. Code, §§ 23-1301-1309), "are based on 'bail/no bail' or 'release/no release' schemes, which, in turn, are based on legal and evidence-based pretrial practices such as those found in the American Bar Association's Criminal Justice Standards on Pretrial Release. Indeed, each statute contains general legislative titles describing the process as either 'release' or 'detention' during the pretrial phase, and each starts the bail process by

The United States Supreme Court has long recognized the gravity of the interests abridged by pretrial detention.  As the court explained in *Stack v. Boyle* (1951) 342 U.S. 1 (*Stack*), "federal law has unequivocally provided that a person arrested for a non-capital offense *shall* be admitted to bail" because "[t]his traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction.  [Citation.]  Unless this right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning." (*Id*. at p. 4, fns. omitted.)  In his oft-cited concurring opinion, Justice Jackson amplified this point:  "The practice of admission to bail, as it has evolved in Anglo-American law, is not a device for keeping persons in jail upon mere accusation until it is found convenient to give them a trial.  On the contrary, the spirit of the procedure is to enable them to stay out of jail until a trial has found them guilty.  Without this conditional privilege, even those wrongly accused are punished by a period of imprisonment while awaiting trial and are handicapped in consulting counsel, searching for evidence and witnesses, and preparing a defense.[13]  To open a way of escape from

providing judges with four options:  (1) release on personal recognizance or with unsecured appearance bond; (2) release on a condition or combination of conditions; (3) temporary detention; or (4) full detention.  Each statute then has a provisions describing how each release or detention option should function.  [¶]  Because they successfully separate bailable from unbailable defendants, thus allowing the system to lawfully and transparently detain unbailable defendants with essentially none of the conditions associated with release (including secured financial conditions), both statutes are also able to include sections forbidding financial conditions that result in the preventive detention of the defendant—an abuse seen frequently in states that have not fully incorporated notions of a release/no release system." (Schnacke, Fundamentals of Bail: A Resource Guide for Pretrial Practitioners and a Framework for American Pretrial Reform, National Inst. of Corrections (Sept. 2014) p. 29.)

[13] These are by no means the only adverse collateral consequences of pretrial detention. As has been noted, "[t]he stress of incarceration—or even just the threat of jail time—frequently prompts defendants to plead guilty and give up their right to trial . . . . [I]t 'is a self-fulfilling system; defendants have to plea, and end up with a record,' which permanently labels them as criminal, which in turn further influences judges when setting bail in future cases.  Virtually all individuals charged with low-level offenses who face an unaffordable bail amount end up accepting a plea, thereby absolving the state of its

this handicap and possible injustice, Congress commands allowance of bail for one under charge of any offense not punishable by death [citation], providing: 'a person arrested for an offense not punishable by death shall be admitted to bail . . .' before conviction." (*Id*. at pp. 7-8 (conc. opn. of Jackson, J.); see also *Gerstein v. Pugh* (1975) 420 U.S. 103, 114, 123 [recognizing that "[p]retrial confinement may imperil the suspect's job, interrupt his source of income, . . . impair his family relationships" and undermine his "ability to assist in preparation of his defense"].)

The Bail Reform Act amended federal law by authorizing courts to make release decisions that not only consider the likelihood an arrestee might flee, as under prior law, but also "give appropriate recognition to the danger a person may pose to others if released." (*Salerno, supra,* 481 U.S. at p. 742.)[14]  Although the federal bail system is not based on secured money bail, petitioner relies upon *Salerno* because of the heavy emphasis the opinion places on the extensive safeguards mandated by the Bail Reform Act to assure the accuracy of a judicial assessment that the release of a particular arrestee would endanger public safety.  These safeguards, which the court relied upon in

burden to prove the case beyond a reasonable doubt . . . .  'Individuals who insist on their innocence and refuse to plead guilty get held . . . .'  And while the plea might prevent detention altogether or at least allow a return to productivity outside the jail cell, it may also come with a criminal record.' " (Goff, *Pricing Justice: The Wasteful Enterprise of America's Bail System* (2017) 82 Bklyn. L.Rev. 881, 882, fns. omitted.)  This article also describes a recent study showing that approximately two-thirds of the households with a family member in jail or prison struggle to meet their most essential needs, "nearly 50% are unable to purchase enough food or pay for housing.  For one-third of families who were living above the poverty line before making contact with the criminal justice system, the expenses associated with incarceration or jail time—such as phone, commissary, and travel costs—pushed them into debt." (*Id*. at p. 899, fns. omitted.)

[14] The 1966 Act (Pub. L. No. 89-465, 80 Stat. 214) provided that non-capital defendants were to be released pending trial unless the court determined that such release did not adequately ensure a defendant's appearance.  It also required the court to choose the least restrictive alternatives from a list of conditions designed to secure a defendant's appearance.  The bail of defendants charged with a capital offense was determined on the basis of different criteria which took public safety into account.

upholding the statute, are relevant to our consideration of the inquiries and findings necessary before a presumptively innocent arrestee may be detained prior to trial.

The defendants in *Salerno* were charged with 35 acts of racketeering activity, including fraud, extortion, gambling and conspiracy to commit murder. At their arraignment, the government moved to have them detained prior to trial on the ground that "no condition of release would assure the safety of the community or any person," and made a detailed proffer of evidence that, among other things, respondents had engaged in wide-ranging conspiracies to aid their illegal enterprises through violent means, and Salerno had personally participated in two murder conspiracies. (*Salerno, supra,* 481 U.S. at p. 743.)

The trial court granted the government's detention motion after concluding that the government had established by clear and convincing evidence that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," the determinations necessary to order an arrestee's detention under the Bail Reform Act. (*Salerno*, *supra*, 481 U.S. at pp. 743-744.) The Court of Appeals reversed, finding the Bail Reform Act's " 'authorization of pretrial detention [on the ground of future dangerousness] repugnant to the concept of substantive due process, which we believe prohibits the total deprivation of liberty simply as a means of preventing future crimes.' [Citation.] The [Court of Appeals] concluded that the Government could not, consistent with due process, detain persons who had not been accused of any crime merely because they were thought to present a danger to the community." (*Salerno*, at p. 744.)

Rejecting that conclusion, the Supreme Court reasoned that the pretrial detention authorized by the Bail Reform Act is not impermissible punishment but a regulatory measure designed to protect community safety that is constitutionally justified by the "legitimate and compelling" government interest in preventing crime committed by arrestees. (*Salerno, supra,* 481 U.S. at p. 749.) In appropriate circumstances, the court declared, such detention can outweigh an arrestee's liberty interest. (*Id*. at pp. 747-752.)

26

*Salerno* described the protections included in the Bail Reform Act as follows: "The Government must first of all demonstrate probable cause to believe that the charged crime has been committed by the arrestee, but that is not enough. In a full-blown adversary hearing, the Government must convince a neutral decisionmaker by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person. [Citation]." (*Salerno, supra,* 481 U.S. at p. 750.) "Detainees have a right to counsel at the detention hearing. [Citation.] They may testify in their own behalf, present information by proffer or otherwise, and cross-examine witnesses who appear at the hearing. [Citation.] The judicial officer charged with the responsibility of determining the appropriateness of detention is guided by statutorily enumerated factors, which include the nature and the circumstances of the charges, the weight of the evidence, the history and characteristics of the putative offender, and the danger to the community. [Citation.] The Government must prove its case by clear and convincing evidence. [Citation.] Finally, the judicial officer must include written findings of fact and a written statement of reasons for a decision to detain. [Citation.] The Act's review provisions, [citation], provide for immediate appellate review of the detention decision." (*Id.* at pp. 751-752.)

As an en banc panel of the Ninth Circuit has observed, *Salerno* "concluded that the Bail Reform Act satisfied heightened scrutiny because it both served a 'compelling' and 'overwhelming' governmental interest 'in preventing crime by arrestees' and was 'carefully limited' to achieve that purpose," and "sufficiently tailored because it 'careful[ly] delineat[ed] . . . the circumstances under which detention will be permitted.' " (*Lopez-Valenzuela v. Arpaio, supra,* 770 F.3d at p. 779.)

The Ninth Circuit went on to note that "[i]f there was any doubt about the level of scrutiny applied in *Salerno*, it has been resolved in subsequent Supreme Court decisions, which have confirmed that *Salerno* involved a fundamental liberty interest and applied heightened scrutiny. See [*Reno v.*] *Flores* [(1993)] 507 U.S. [292,] 301-02 . . . (O'Connor, J. concurring); *Foucha v. Louisiana* [(1992)] 504 U.S. 71, 80-83 (Kennedy, J. dissenting). *Salerno* and the cases that have followed it have recognized that '[f]reedom

27

from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action.' *Foucha*, 504 U.S. at 80. Thus, '[t]he institutionalization of an adult by the government triggers heightened substantive due process scrutiny.' *Flores*, 507 U.S. at 316 (O'Connor, J., concurring). As the Court explained in *Salerno,* [*supra,*] 481 U.S. at 755, 'liberty is the norm, and detention prior to trial or without trial is the carefully limited exception.' See also *Zadvydas v. Davis* [(2001)] 533 U.S. 678, 690 ('Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects.'); *Foucha*, 504 U.S. at 90 (Kennedy, J. dissenting.) ('As incarceration of persons is the most common and one of the most feared instruments of state oppression and state indifference, we ought to acknowledge at the outset that freedom from this restraint is essential to the basic definition of liberty in the Fifth and Fourteenth Amendments of the Constitution.') Thus, [the Arizona constitutional provision prohibiting state courts from setting bail for detainees illegally in the country] will satisfy substantive due process only if they are 'narrowly tailored to serve a compelling state interest.' *Flores*, 507 U.S. at 302 (citing *Salerno*, 481 U.S. at 746.)" (*Lopez-Valenzuela v. Arpaio, supra*, 770 F.3d 772 at pp. 780-781.)

Because the federal bail scheme at issue in *Salerno* is not a money-bail system, the court had no need to address the issues presented by such a system when the applicant for bail is indigent or impecunious. *Turner v. Rogers* (2011) 564 U.S. 431 (*Turner*) is instructive in this regard. *Turner* addressed the question whether a father facing the possibility of incarceration for civil contempt due to his inability to pay a child support order had a right to court-appointed counsel. Noting that the proceeding was civil and therefore required "fewer procedural protections than in a criminal case" (*id.* at p. 442), the court "determine[d] the 'specific dictates of due process' by examining the 'distinct factors' that this Court has previously found useful in deciding what specific safeguards the Constitution's Due Process Clause requires in order to make a civil proceeding fundamentally fair," namely, "(1) the nature of 'the private interest that will be affected,' (2) the comparative 'risk' of an 'erroneous deprivation of that interest with and without

'additional or substitute procedural safeguards,' and (3) the nature and magnitude of any countervailing interest in not providing 'additional or substitute procedural requirement[s].' " (*Id.* at pp. 444-445, citing *Mathews v. Eldridge* (1976) 424 U.S. 319, 335.)

*Turner* recognized that the gravity of "the private interest that will be affected" argued strongly for the right to counsel. An indigent defendant's loss of personal liberty through imprisonment demands due process protection, the court declared, because "[t]he interest in securing that freedom, the freedom 'from bodily restraint,' lies at the core of the liberty protected by the Due Process Clause." (*Turner, supra,* 564 U.S. at p. 445, quoting *Foucha v. Louisiana, supra,* 504 U.S. at p. 80.) The court ultimately found this interest outweighed by a combination of three considerations that militated against an automatic right to state-provided counsel in civil proceedings that might result in imprisonment. One of those considerations is particularly significant for our purposes: the availability of "a set of 'substitute procedural safeguards' *Mathews*, [*supra*,] 424 U.S. at 335 . . . , which, if employed together, can significantly reduce the risk of an erroneous deprivation of liberty . . . without incurring some of the drawbacks inherent in recognizing an automatic right to counsel." (*Turner, supra*, 564 U.S. at p. 447.)[15] Those safeguards included "(1) notice to the defendant that his 'ability to pay' is a critical issue in the contempt proceeding; (2) the use of a form (or the equivalent) to elicit relevant financial information; (3) an opportunity at the hearing for the defendant to respond to statements and questions about his financial status (e.g., those triggered by his responses on the form); and (4) an express finding by the court that the defendant has the ability to pay." (*Id.* at pp. 447-448.) The court made it clear that the "alternative procedural

---

[15] The other two factors were (1) that a defendant's ability to pay is closely tied to indigence, which is in many cases "sufficiently straightforward" to be determined prior to providing a defendant with counsel; and (2) sometimes the person opposing the defendant is not the government represented by counsel but the custodial parent who is unrepresented by counsel, so that providing the defendant counsel "could create an asymmetry of representation" that would distort the nature of the proceeding. (*Turner, supra,* 564 U.S. at pp. 446-447.)

safeguards" it described were examples, not a complete list of what was required by due process, and that the state could provide procedures "equivalent" to those identified by the court. (*Id*. at p. 448.)

A determination of ability to pay is critical in the bail context to guard against improper detention based only on financial resources. Unlike the federal Bail Reform Act,[16] however, our present bail statutes only require a court to consider a defendant's ability to pay if the defendant raises the issue. (§ 1270.1, subd. (c).) This leaves in the hands of the defendant a matter that is the trial court's responsibility to ensure—that a defendant not be held in custody solely because he or she lacks financial resources. (See *De Luna v. Hidalgo County* (S.D. Tex. 2012) 853 F.Supp.2d 623, 648 ["the absence of any inquiry into a defendant's indigency unless the defendant 'raises' it of his or her own accord does not provide the process due" and "risks that defendants who do not think to 'speak up' during arraignment about their inability to pay fines may be jailed solely by reason of their indigency, which the Constitution clearly prohibits"].) Furthermore, section 1270.1, subdivision (c), applies only where a person arrested for specified offenses (expressly excluding first degree residential burglary, petitioner's offense) is to be released on his or her own recognizance or bail in an amount that is more or less than that specified for the offense on the bail schedule. (§ 1270.1, subd. (a).) While section 1275 identifies factors to be considered by the court in setting, reducing or denying bail, including factors pertaining to whether release of the arrestee would endanger public safety, it does not include consideration of the defendant's ability to fulfill a financial condition of release. Nor does section 1269c, which authorizes the setting of bail in

---

[16] The Bail Reform Act expressly provides that "[t]he judicial officer may not impose a financial condition that results in the pretrial detention of the person." (18 U.S.C. § 3142(c)(2).) Among the factors required to be considered "in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community," are "the history and characteristics of the person, including . . . [¶] . . . financial resources . . . ." (18 U.S.C. § 3142(g)(3).)

amounts greater or lower than that specified in the bail schedule, require any judicial consideration of the arrestee's financial circumstances.

The *Bearden* line of cases, together with *Salerno* and *Turner*, compel the conclusion that a court which has not followed the procedures and made the findings required for an order of detention must, in setting money bail, consider the defendant's ability to pay and refrain from setting an amount so beyond the defendant's means as to result in detention.

If the court concludes that an amount of bail the defendant is unable to pay is required to ensure his or her future court appearances, it may impose that amount only upon a determination by clear and convincing evidence that no less restrictive alternative will satisfy that purpose. We believe the clear and convincing standard of proof is the appropriate standard because an arrestee's pretrial liberty interest, protected under the due process clause, is "a fundamental interest second only to life itself in terms of constitutional importance." (*Van Atta v. Scott* (1980) 27 Cal.3d 424, 435; see *Santosky v. Kramer* (1982) 455 U.S. 745. 756 ["This court has mandated an intermediate standard of proof—'clear and convincing evidence'—when the individual interests at stake in a state proceeding are both 'particularly important' and 'more substantial than mere loss of money' "]; *Addington v. Texas* (1979) 441 U.S. 418, 427 ["the individual's interest in the outcome of a civil commitment proceeding is of such weight and gravity that due process requires the state to justify confinement by proof more substantial than a mere preponderance of the evidence"]; § 12 [clear and convincing evidence required to establish facts necessary for exception to constitutional right to pretrial release in non-capital cases].)

Another protection that *Salerno* identified in the federal Bail Reform Act and *Turner* discussed, express findings and statements of decision (*Salerno, supra,* 481 U.S. at p. 752; *Turner, supra*, 564 U.S. at p. 447), is also of particular importance in ensuring that orders for release on bail do not become de facto detention orders. Although our bail

statutes require statements of reasons to only a limited degree,[17] section 28, subdivision (f)(3), requires that when a judicial officer grants or denies bail or release on a person's own recognizance, "the reasons for that decision shall be stated in the record and included in the court's minutes." The significance of a statement of reasons is discussed in *In re Podesto* (1976) 15 Cal.3d 921, 937-938 (*Podesta*) and *In re Pipinos* (1982) 33 Cal.3d 189 (*Pipinos*). These cases addressed the adequacy of judicial explanations of the reasons for denying release pending appeal, but their guidelines are also useful in the context of pretrial detention. Because the liberty interest of a convicted person awaiting appeal is less than that of an accused person awaiting trial—there is no absolute right to bail on appeal, and the grant of such bail is totally within the trial court's discretion (§ 1272)—[t]he rules governing the setting of bail pending trial must be at least as rigorous as those governing the setting of bail on appeal." (*In re Christie, supra*, 92 Cal.App.4th at p. 1109.)

*Podesto* upheld section 1272, which governs release after conviction pending probation or appeal, and held that trial courts "should render a brief statement of reasons in support of an order denying a motion for bail on appeal." (*Podesto, supra*, 15 Cal.3d at p. 938.) Explicit judicial findings "serve several worthy purposes: They help to assure a realistic review by providing a method of evaluating a judge's decision or order; they guard against careless decision making by encouraging the trial judge to express the grounds for his decision; and they preserve public confidence in the fairness of the judicial process." (*In re John H*. (1978) 21 Cal.3d 18, 23, citing *Podesto,* at p. 937.)

*Pipinos, supra*, 33 Cal.3d 189, found insufficient a trial court's statement that the defendant's bail application was denied because he posed a " 'substantial flight risk,' " represented " 'some risk to society,' " and did not have a " 'substantial likelihood of

---

[17] The bail statutes only require a court to state reasons on the record if it departs from the amount specified on the bail schedule in cases involving enumerated offenses (§ 1270.1, subd. (d)), and to find "unusual circumstances" and "set forth those facts on the record" if it reduces bail below the amount on the bail schedule for a person charged with a serious or violent felony (§ 1275, subd. (c)).

success on appeal.' " The Supreme Court found these comments did not promote the "goal of ensuring that judges engage in careful and reasoned decisionmaking. Once defendant came forward with evidence in support of his application for release . . . the court was duty-bound to articulate its evaluative process and show how it weighed the evidence presented in light of the applicable standards." (*Id*. at p. 198, citing *Podesto, supra*, 15 Cal.3d at p. 938.) The trial court's statement was inadequate because "it does not identify the specific facts which persuaded the court that bail would be inappropriate in this case. The court simply based its denial of bail on the bare conclusions that there was a likelihood the defendant would flee and would continue his criminal activities as a dealer of controlled substances, and that his appeal was meritless." (*Pipinos*, at pp. 198-199.)

With respect to the likelihood of flight, the *Pipinos* court considered the factors noted in *Podesto*: "Because the primary purpose of bail is assurance of continued attendance at future court proceedings [citation], a defendant to qualify for release on appeal must satisfactorily demonstrate that the likelihood of his flight is minimal in light of the following three criteria: '(1) the defendant's ties to the community, including his employment, the duration of his residence, his family attachments and his property holdings; (2) the defendant's record of appearance at past court hearings or of flight to avoid prosecution; and (3) the severity of the sentence defendant faces.' " (*Pipinos, supra*, 33 Cal.3d at p. 199, quoting *Podesto, supra*, 15 Cal.3d at pp. 934-935.) Pipinos satisfied the first two criteria, but the trial court was " 'persuaded that he wouldn't give much pause to flee,' " solely on the ground that he faced a four-year prison term. This was improper, the Supreme Court stated, because *Podesto* requires that one factor be weighed against the others, "and the court's failure to mention the other factors . . . does not permit us to review in what manner, if at all, it balanced defendant's community ties and record of court appearances against the incentive to flight suggested by the prison term.' " (*Pipinos,* at p. 199.) This balancing is required because "otherwise denial of bail would be proper in any case in which a prison term is imposed, regardless of offsetting factors presented by defendant." (*Id*. at p. 200.) Additionally, the absence of balancing

33

"fails to promote the policy purpose underlying our requirement of a statement of reasons—guarding against careless decisionmaking.  Although the court may very well have engaged in careful analysis of the facts and law, its failure to articulate its reasons for finding defendant a flight risk leaves us without the benefit of its analysis." (*Ibid*.)

*Pipinos* also concluded the trial court's finding that the defendant was a " 'danger to society' " was "deficient with respect to providing a basis for meaningful review and guarding against careless decisionmaking." (*Pipinos, supra,* 33 Cal.3d at p. 200.)  The trial court did "not expressly state that there is a probability that defendant will continue to engage in criminal conduct.  Instead, the court obliquely refers to defendant's 'basic character flaws,' and bases its conclusion of danger to society on the fact that there is no evidence of a 'metamorphosis.'  We may conceivably infer that the court found, based on its assessment of defendant's character, that it was unlikely that defendant would forego his profitable trafficking in controlled substances.  However, a primary purpose of the *Podesto* requirement of a statement is precisely to prevent this type of speculative judicial second-guessing, especially when, as here, we are asked to draw inferences as to inferences the trial court might have drawn." (*Ibid*.)  "Because of the court's failure to articulate its reasons for finding defendant a danger to the community, we cannot ascertain the manner in which the court exercised its discretion.  We do not know if the denial of bail was based upon the circumstances and propensities of the individual defendant, or whether it was based upon precisely the generalizations of future criminality *Podesto*'s standards were meant to prevent.  *Podesto* urges caution in denying bail based on the propensities of the defendant and warns courts 'not [to] adopt an ironclad, mechanical policy of denying bail to all who commit a particular crime.' [Citations.]" (*Id*. at p. 201.)

The trial court in the present case explained its reasons to the extent required by the bail statutes, which was only to explain that it found petitioner's community ties and willingness to engage in treatment constituted "unusual circumstances" justifying deviation from the bail schedule.  (§§ 1275, subd. (c), 1270.1, subd. (d).)  Of greatest significance, it did not explain why, despite commending petitioner for his willingness to

34

participate in supervised residential drug treatment and ordering participation in such treatment as a condition of release, it simultaneously precluded release by setting an amount of money bail it was told petitioner could not pay.[18] The court's failure to explain the reasoning behind this incongruous order makes it impossible for us to know whether the trial court's determinations that petitioner was dangerous and presented a flight risk were based upon an individualized evaluation of his circumstances and propensities or solely upon "the generalizations of future criminality *Podesto*'s standards were meant to prevent," (*Pipinos, supra*, 33 Cal.3d at p. 201), or even whether the court fully recognized the incongruity of its decision.

### III.
### *Bail Determinations Must be Based upon Consideration*
### *of Individualized Criteria*

Failure to consider a defendant's ability to pay before setting money bail is one aspect of the fundamental requirement that decisions that may result in pretrial detention must be based on factors related to the individual defendant's circumstances. This requirement is implicit in the principles we have discussed—that a defendant may not be imprisoned solely due to poverty and that rigorous procedural safeguards are necessary to assure the accuracy of determinations that an arrestee is dangerous and that detention is required due to the absence of less restrictive alternatives sufficient to protect the public.

*Stack, supra,* 342 U.S. 1, illustrates the significance of individualized bail determinations (a point subsequently reiterated in *Salerno, supra,* 481 U.S. at p. 750). The 12 petitioners in *Stack* were charged with conspiring to violate the Smith Act, which made it a criminal offense to advocate the violent overthrow of the government or to organize or be a member of any group devoted to such advocacy. (*Stack,* at p. 3.) After bail was fixed in the uniform amount of $50,000 for each petitioner, they moved to

---

[18] The stay-away order also suggests internal inconsistency in the court's order, in that it would only be necessary if petitioner was not detained, but this aspect of the order is more readily explained as a safeguard included even in orders for detention, as a protection for the victim in case a defendant is later able to obtain release.

reduce the amount as excessive, submitting statements regarding their individual circumstances and financial resources, none of which was controverted by the government. (*Ibid.*)

The only evidence presented by the government was a showing that four persons previously convicted under the Smith Act in a federal court in another state had forfeited bail. Noting that petitioners were exposed to imprisonment for no more than five years and a fine of not more than $10,000, and that the government did not deny bail had been fixed in a sum much higher than that usually imposed for offenses with like penalties, the court questioned the government's failure to make any factual showing justifying the unusually high amount of bail uniformly fixed for each of the four petitioners. "Since the function of bail is limited, the fixing of bail for any individual defendant must be based upon the standards relevant to the purpose of assuring the presence of *that defendant*. . . ." (*Stack, supra,* 342 U.S. at p. 5, italics added.) As Justice Jackson observed, "[e]ach defendant stands before the bar of justice as an individual. Even on a conspiracy charge[,] defendants do not lose their separateness or identity. . . . The question when application for bail is made relates to each one's trustworthiness to appear for trial and what security will supply reasonable assurance of his appearance." (*Id.* at p. 9, conc. opn. of Jackson, J.)

The $600,000 bail initially ordered in this case was prescribed by the county bail schedule, which was also the anchor for the $350,000 reduced bail order. [19] Bail

---

[19] In response to the court's request that he inform the "Clerk of this Court" in writing how the bail schedule amount of $600,000 was calculated, petitioner's counsel stated that he "is unable to explain with any degree of certainty how money bail was calculated" and "because the San Francisco bail schedule incorporates no instructions for how to administer its list of offenses and dollar amounts, different sheriff's employees and different magistrates apply different principles." After consultation with the Attorney General, however, petitioner believes the most likely scenario is as follows: "To avoid 'stacking' bail amounts for different charges arising out of the same incident (a common practice throughout the state and in many cases in San Francisco) the Assistant District Attorney in this case only applied the money bail amount for one of the charges, in this case the residential burglary, because that is the charge with the highest scheduled bail. There were two enhancements applied to that charge (an elderly victim and the

36

schedules provide standardized money bail amounts based on the offense charged and prior offenses, regardless of other characteristics of an individual defendant that bear on the risk he or she currently presents.[20] These schedules, therefore, represent the antithesis of the individualized inquiry required before a court can order pretrial detention. Bail schedules have been criticized as undermining the judicial discretion necessary for individualized bail determinations, as based on inaccurate assumptions that defendants

---

presence of a person during the burglary), and these amounts ($100,000 each) were added to the total, even though these enhancements arguably constitute 'stacking' since the presence of the victim is counted twice. There were also allegations of four serious priors, each of which would add $100,000 to the total bail amount. However, because two of the priors are from the same date and county, those were counted as one offense for purposes of applying the bail schedule. Therefore, money bail enhancements were added for three serious priors. In sum, the likely breakdown of the $600,000 money bail amount was: [scheduled bail for residential burglary in the amount of $100,000 and $100,000 for each of five enhancement allegations (a person was present in the residence; crime against an elderly victim; and three prior convictions) in 1980, 1986 and 1992).]"

Petitioner's counsel also noted that "nothing on the face of the bail schedule required this computation of money bail. The bail schedule contains no instruction on how financial conditions of release should be calculated, including whether money bail should be 'stacked' or whether prior convictions from the same date should be counted separately or together for the purpose of adding bail enhancements. The schedule offers no instructions for what to do when the presence of a victim would form the basis for several enhancements, one due to the victim's presence and another due to the victim's age."

[20] Superior court judges in each county are required to "prepare, adopt, and annually revise a uniform countywide schedule of bail" for all bailable felony and for all misdemeanor and infraction offenses except Vehicle Code infractions. (§ 1269b, subd. (c).) In adopting the schedule of bail for all bailable felony offenses, "the judges shall consider the seriousness of the offense charged. In considering the seriousness of the offense charged the judges shall assign an additional amount of required bail for each aggravating or enhancing factor chargeable in the complaint, including, but not limited to, additional bail for charges alleging facts that would bring a person within [specified statutes defining certain violent and serious felony offenses]. [¶] In considering offenses in which a violation of [specified provisions of the Health and Safety Codes] is alleged, the judge shall assign an additional amount of required bail for offenses involving large quantities of controlled substances." (§ 1269b, subd. (e).)

charged with more serious offenses are more likely to flee and reoffend,[21] and as enabling the detention of poor defendants and release of wealthier ones who may pose greater risks.[22]

---

[21] Bail schedules are based on the theory that more serious crimes are punished by higher penalties and it is therefore more likely that the defendant will flee and prove dangerous and re-offend if released. However, as a thoughtful San Francisco Superior Court judge who has studied the subject points out, "the evidence does not support the proposition that the severity of the crime has any relationship either to the tendency to flee or the likelihood of re-offending." (Karnow, *Setting Bail for Public Safety* (2008) 13 Berkeley J. of Crim. L. 1, 14.) According to Judge Karnow, "the most exhaustive empirical studies of bail practices in the United States" which he discusses at length, suggest instead "that the severity of the crime cannot be used as a proxy for the danger posed by the defendant if he were released on bail. Accordingly, the current practice by which judges simply follow the bail schedules is, to put it delicately, of uncertain utility." (*Id.* at pp. 15, 16, fn. omitted; see also, Arkfeld, *The Federal Bail Reform Act of 1984: Effect of the Dangerousness Determination on Pretrial Detention* (1988) 19 Pac. L.J. 1435, 1444-1445 [referring to studies by the National Bureau of Standards and Harvard University].)

[22] The Standards for Criminal Justice promulgated by the American Bar Association "flatly rejects the practice of setting bail amounts according to a fixed bail schedule based on charge," because such schedules "are arbitrary and inflexible: they exclude consideration of factors other than the charge that may be far more relevant to the likelihood that the defendant will appear for court dates. The practice of using bail schedules leads inevitably to the detention of some persons who would be good risks but are simply too poor to post the amount of bail required by the bail schedule. They also enable the unsupervised release of more affluent defendants who may present real risks of flight or dangerousness, who may be able to post the required amount easily and for whom the posting of bail may be simply a cost of doing 'business as usual.' " (ABA Standards for Crim. Justice, Pretrial Release (3d ed. 2007) com. to std. 10-5.3 (e).) The Fifth Circuit has agreed, stating in *Pugh v. Rainwater, supra,* 572 F.2d 1053 that "[u]tilization of a master bond schedule provides speedy and convenient release for those who have no difficulty meeting its requirements. The incarceration of those who cannot, without meaningful consideration of other possible alternatives, infringes on both due process and equal protection requirements." (*Id.* at p. 1057, citing Wisotsky, *Use of a Master Bond Schedule: Equal Justice Under Law?* (1970) 24 Univ. of Miami L.Rev. 808; *The Unconstitutional Administration of Bail: Bellamy v. The Judges of New York City* (1972) 8 Crim. Law Bulletin 459; Note, *Bail and its Discrimination Against the Poor: A Civil Rights Action as a Vehicle of Reform* (1974) 9 Valparaiso Univ. L.Rev. 167.) See also *Pierce v. City of Velda City* (E.D. Mo. June 3, 2015) No. 4:15-CV-00570 [2015 U.S. Dist. Lexis 176261] [enjoining the defendant city's "use of a secured bail schedule to set

Petitioner does not facially challenge the use of the San Francisco bail schedule. Nor do we condemn the trial court's consultation of the schedule: Such consultation is statutorily required, because for serious or violent felonies the court cannot depart from the amount prescribed by the schedule without finding unusual circumstances. (§ 1275, subd. (c).) The nature of the present charges against petitioner and his prior offenses are relevant to assessment of his dangerousness, and the schedule provides a useful measure of the relative seriousness of listed offenses. The bail schedule also serves useful functions in providing a means for individuals arrested without a warrant to obtain immediate release without waiting to appear before a judge (§ 1269b),[23] as well as a starting point for the setting of bail by a judge issuing an arrest warrant or for a court setting bail provisionally in order to allow time for assessment of a defendant's financial resources and less restrictive alternative conditions by the pretrial services agency, or if a defendant does not oppose pretrial detention.[24] As this case demonstrates, however, unquestioning reliance upon the bail schedule without consideration of a defendant's ability to pay, as well as other individualized factors bearing upon his or her dangerousness and/or risk of flight, runs afoul of the requirements of due process for a

---

the conditions for release of a person in custody after arrest for an offense that may be prosecuted by [the city]"].)

[23] Under section 1269b, subdivisions (a) and (b), if the defendant has not appeared before a judge on the charge contained in the complaint, indictment, or information, "the bail shall be in the amount fixed in the warrant of arrest or, if no warrant for arrest has been issued, the amount of bail shall be pursuant to the uniform countywide schedule of bail for the county in which the defendant is required to appear. . . ." (§ 1269b, subd. (b).)

[24] While the bail schedules may be particularly useful to overburdened courts in low risk misdemeanor and traffic offenses, allowing arrestees an opportunity to obtain immediate release (especially on weekends and evenings when courts are not in session) and avoiding the need for unnecessary bail hearings, it has been pointed out that the low bail amounts for such offenses "simply serve as an arrest fine or tax on those defendants who can make bail, while detaining those who can't," and swift release could be less onerously facilitated by release on personal recognizance or unsecured bonds. (Carlson, *Bail Schedules, A Violation of Judicial Discretion?* Crim. Justice (Spring 2011) p. 14.)

decision that may result in pretrial detention. Once the trial court determines public and victim safety do not require pretrial detention and a defendant should be admitted to bail, the important financial inquiry is not the amount prescribed by the bail schedule but the amount necessary to secure the defendant's appearance at trial or a court-ordered hearing.

Despite the widespread criticism of bail schedules, setting bail in the amount prescribed by the bail schedule remains the default position in this state,[25] and the practice may well be encouraged by the fact that by declining to depart from the bail schedule a court relieves itself of the statutory duty to state reasons. (See § 1270.1, subd. (d).) For poor persons arrested for felonies, reliance on bail schedules amounts to a virtual presumption of incarceration. According to a San Francisco study, last year 85 percent of the inmates of the county jail were awaiting trial and "[o]f these, 40-50% could be released if they could afford to pay their bail." (The Financial Justice Project, Office of the Treasurer & Tax Collector of the City and County of San Francisco, Do the Math: Money Bail Doesn't Add up for San Francisco (June 2017) p. 4.) While these statistics, corroborated by other recent studies,[26] do not indicate the corresponding percentage of

---

[25] See footnote 23, *ante*.

[26] For example, an analysis of county jail populations in California during 2014-2015 shows that 5,584 persons were booked into the San Francisco County Jail for the mean number of five days although charges were never made against them or were dismissed, and the cost to the county of those detentions, which numbered 28,671 days, was $3,264,766.77. (Human Rights Watch, "Not in it for Justice": How California's Pretrial Detention and Bail System Unfairly Punishes Poor People (Apr. 2017) p. 43.) The statewide statistics are not materially different. A 2015 study by the California Department of Justice shows that roughly one-third of the 1,451,441 individuals arrested for felonies in this state between 2011 and 2015, 459,9847 were never found guilty of any crime, charges were not even filed against 273,899 of them, and all but a small fraction were detained due to the inability to post the amount of bail set. (Criminal Justice Statistics Center, Cal. Dept. of Justice, Crime in California (2015) p. 49.)

An analysis of 2000-2009 data from the US Department of Justice reveals that California's large urban counties "relied more heavily on pretrial detention of felony defendants (59% detained), compared with other large urban counties in the United States (32% detained), even after accounting for differences in the composition of defendants. But the state still had higher rates of failure to appear in court and higher levels of felony

arrestees who were released pending trial, for the population unable to afford money bail they make a mockery of the Supreme Court's observation in *Salerno* that prior to trial "liberty is the norm." (*Salerno, supra*, 481 U.S. at p. 755.)

In the present case, as we have said, the prosecution did not present *any* evidence, let alone clear and convincing evidence, to establish that "no condition or combination of conditions of release would ensure the safety of the community or any person" (*Salerno, supra*, 481 U.S. at pp. 743-744), thereby justifying abridgment of petitioner's liberty interest while awaiting trial. To the contrary, the prosecution did not dispute that any risk petitioner posed to victim and public safety could be sufficiently mitigated with the conditions of release the court imposed, and the court, by ordering petitioner's release on money bail with these conditions, implicitly so found. The conditions requiring petitioner to participate in the supervised residential drug treatment program and to stay away from the victim, addressed the particular circumstances of petitioner and the offense, but the bail amount was based solely on the bail schedule rather than any individualized inquiry into the amount necessary to satisfy the purposes of money bail in this case. And while the court attempted to acknowledge petitioner's circumstances by lowering the initially set amount of bail, the reduction from $600,000 to $350,000 was ineffectual. The reduction could be meaningful only if the court had reason to believe it possible for petitioner to post bail in the lower amount; but the court did not find or explain such a possibility, and the record suggests that, as defense counsel stated, petitioner was no more able to post bail in the amount of $350,000 than he was to post bail in the amount of $600,000. Nothing in the record suggests petitioner's claim of indigency was not bona fide, and neither the district attorney nor the court questioned the veracity of the claim. The court thus reached the anomalous result of finding petitioner suitable for release on bail but, in effect, ordering him detained (and therefore rendering

_____

rearrests during the pretrial period." (Tafoya et al., Pretrial Release in California (May 2017) Public Policy Institute of California, p. 5.)

41

him unable to participate in the treatment program the court had made a condition of release).

## IV.

### *The Relief to Which Petitioner is Entitled*

As we have said, two provisions of the California Constitution bear on the issue of pretrial release on bail:  Section 12, establishing the right to pretrial release on bail except in enumerated circumstances, and section 28, making victim and public safety the primary consideration in bail decisions.  Section 12, which addresses only the subject of bail, limits the cases in which a defendant is *not* entitled to release to those involving capital crimes or involving certain other felonies if it is established by clear and convincing evidence that release would result in a substantial likelihood of great bodily harm to others.  Section 28 establishes a number of rights for crime victims, one of which is the right to have the victim's safety considered in "fixing the amount of bail and release conditions for the defendant" (§ 28, subd. (b)(3)), and several rights shared by victims and the public, including that victim and public safety be the "primary considerations" in "setting, reducing or denying bail."  (§ 28, subd. (f)(3).)

The Attorney General, in his return to the order to show cause, argued that these provisions should be "reconcile[d]" by interpreting section 28 as requiring courts to make public safety and safety of the victim the primary considerations in decisions to deny bail, set the amount of bail or release a defendant on his own recognizance, but "not to the extent of completely displacing section 12's bail provisions."  The Attorney General maintained that section 28's emphasis on safety considerations applied to setting both the amount of money bail and nonmonetary conditions of release, rejecting petitioner's view that the only relevant consideration in setting money bail (as opposed to nonmonetary conditions of release) is risk of flight.[27]  Petitioner urged that there is no need for us to

---

[27] The Attorney General's return expressed concern that the right to bail established by section 12 could be seen as conflicting with subdivision (b)(3) of section 28.  The latter states as follows:  "(b) In order to preserve and protect a victim's rights to justice and due process, a victim shall be entitled to the following rights [¶] . . . [¶] (3) To

reconcile the two constitutional provisions because neither is inconsistent with the requirements that a court considering bail must inquire into the defendant's ability to pay and, if the order would result in pretrial detention, afford the procedural protections required by due process and determine by clear and convincing evidence that no less restrictive alternative would satisfy the government's interests. Petitioner argued that safety considerations bear on nonmonetary conditions of release but not on the amount of money bail, which (as earlier explained) is relevant only to protect against flight risk.

For the first time at oral argument, in his second change of position in this case, the Attorney General advanced the view that section 28 authorizes a court to impose a higher amount of money bail on a defendant found to present a risk to public or victim safety than on one who presented no such risk. Stating that his position had "come into greater clarity" over the course of other litigation in the time since the return in this case was filed, the Attorney General further maintained that defendants who would be entitled to bail under section 12 because they are not charged with capital crimes or, under subdivisions (b) or (c) of that section, found by clear and convincing evidence to have a substantial likelihood of inflicting great bodily harm on others, may be found to present a risk to victim or public safety by a preponderance of the evidence and detained prior to trial if they are unable to afford bail and no less restrictive condition of release is adequate to protect public safety. The Attorney General also maintained that a defendant may be detained under section 28 solely to protect against flight. The Attorney General acknowledged that this view of section 28 would effectively eviscerate section 12.

---

have the safety of the victim and the victim's family considered in fixing *the amount of bail* and release conditions." (Italics added.) Responding to petitioner's argument that the court could not consider public safety in deciding the amount of a monetary condition of pretrial release, the Attorney General's return focused on the italicized phrase and noted that, "[b]ecause monetary bail, unlike nonmonetary conditions, is an 'amount' that can be fixed, it makes little sense to view this clause as applying only to nonmonetary conditions. Moreover, the reference to 'release conditions' in that clause would be surplusage if 'bail' and 'release conditions' meant the same thing."

The suggestion that section 28, in effect, impliedly repealed section 12, as we have said, is a significant departure from the positions the Attorney General took in briefing this case. We decline to resolve the issue, raised as it was so late in these proceedings. (*People v. Crow* (1993) 6 Cal.4th 952, 960, fn. 7 [declining to address argument raised for first time at oral argument]; *People v. Barragan* (2004) 32 Cal.4th 236, 254, fn. 5 [declining to address argument first raised in appellant's reply brief]; *Varjabedian v. City of Madera* (1977) 20 Cal.3d 285, 295, fn. 11 ["Obvious reasons of fairness militate against consideration of an issue raised initially in the reply brief of an appellant"].)[28]

---

[28] As the Attorney General explained in his return to the order to show cause, the provenance of section 28 gives no indication it was meant to render section 12 ineffective. The right to bail has been part of the California Constitution since its adoption in 1849. (*People v. Turner* (1974) 39 Cal.App.3d 682, 684.) Until 1982, the exception stated in section 12 and its predecessors was for capital offenses. (See fn. 8, *ante*.) In 1982, the voters enacted Proposition 4, which amended section 12 by adding as exceptions to the right of bail most of the cases now identified in subdivisions (b) and (c) of section 12. (Ballot Pamp., Primary Elec. (June 8, 1982) text of Prop. 4, p. 17.) A competing initiative in 1982, Proposition 8 (the "Victims' Bill of Rights"), would have repealed section 12, made release on bail permissive rather than mandatory and enacted the language that is presently found in section 28, including making public safety "the primary consideration" in "setting, reducing or denying bail." (Ballot Pamp., Primary Elec. (June 8, 1982) text of Prop. 8, §§ 2, 3, p. 33.) After both initiatives passed, the Supreme Court concluded that the provisions of proposed section 28 were preempted by the proposed amendments to section 12, because Proposition 4 received more votes than Proposition 8. (*In re York, supra*, 9 Cal.4th at p. 1140, fn. 4; see also, *People v. Standish* (2006) 38 Cal.4th 858, 875-878.)

Subsequently, section 28 was enacted in 2008 as Proposition 9 (the "The Victims' Bill of Rights Act of 2008"). Subdivision (f)(3) of section 28 ("Public Safety Bail") contains precisely the same text as the identically titled subdivision (e) of section 28 in 1982, except that it added "safety of the victim" to public safety as the "primary considerations" in "setting, reducing or denying bail." (Voter Information Guide, General Elec. (Nov. 4, 2008) text of Prop. 9, § 4.1, p. 130; Voter Information Guide (June 8, 1982) text of Prop. 8, § 3, p. 33.) But, unlike the 1982 Victims' Bill of Rights, Proposition 9 did *not* repeal section 12.

The Attorney General agreed in his return to the order to show cause that because Proposition 9 did not eliminate the longstanding right to bail under section 12, its passage in 2008 did not impliedly repeal the right to bail under section 12. (*In re Lance W.* (1985) 37 Cal.3d 873, 886 [presumption against repeal obliges courts to reconcile

For the reasons we have discussed, the trial court erred in setting bail at $350,000 without inquiring into and making findings regarding petitioner's ability to pay and alternatives to money bail and, if petitioner's financial resources would be insufficient and the order would result in his pretrial detention, making the findings necessary for a valid order of detention.  Petitioner is entitled to a new bail hearing at which he is afforded the opportunity to provide evidence and argument, and the court considers his financial resources and other relevant circumstances, as well as alternatives to money bail.  If the court determines that petitioner is unable to afford the amount of money bail it finds necessary to ensure petitioner's future court appearances, it may set bail at that amount only upon a determination by clear and convincing evidence that no less restrictive alternative will satisfy that purpose.  The court's findings and reasons must be stated on the record or otherwise preserved.

## V.

### *Closing Observations*

We are not blind to the practical problems our ruling may present.  The timelines within which bail determinations must be made are short, and judicial officers and pretrial service agencies are already burdened by limited resources.

But the problem this case presents does not result from the sudden application of a new and unexpected judicial duty; it stems instead from the enduring unwillingness of our society, including the courts (see, e.g., Foote, *The Coming Constitutional Crisis in*

---

conflicts between constitutional provisions to avoid implying that later enacted provision repeals another existing provision]).  The Attorney General pointed out that the proposed repeal of section 12 in Proposition 8 was the reason Propositions 4 and 8 were found contradictory when enacted in 1982.  As explained in *People v. Standish, supra*, 38 Cal.4th at pages 876-878, Proposition 9 did not mention section 12, and the ballot pamphlet that year did not suggest that the public safety bail provision proposed by Proposition 9 was incompatible in any way with the right to bail provided by section 12.

*Bail: I* (1965) 113 U. Pa. L.Rev. 959-960, 998), to correct a deformity in our criminal justice system that close observers have long considered a blight on the system.[29]

The problem, as our Chief Justice has shown, requires the judiciary, not just the Legislature, to change the way we think about bail and the significance we attach to the bail process. Though legislation is desperately needed, administration of the bail system is committed to the courts. It will be hard, perhaps impossible, for judicial officers to fully rectify the bail process without greater resources than our trial courts now possess. Nevertheless, the highest judicial responsibility is and must remain the enforcement of constitutional rights, a responsibility that cannot be avoided on the ground its discharge requires greater judicial resources than the other two branches of government may see fit to provide. Judges may, in the end, be compelled to reduce the services courts provide, but in our constitutional democracy the reductions cannot be at the expense of presumptively innocent persons threatened with divestment of their fundamental constitutional right to pretrial liberty.

## DISPOSITION

The bail determination is reversed, and the matter is remanded for further proceedings consistent with this opinion.

---

[29] Alexis De Tocqueville, a keen early observer of our criminal procedures, observed in 1835 that our bail system "is hostile to the poor, and favorable only to the rich. The poor man has not always a security to produce . . . ; and if he is obliged to wait for justice in prison, he is speedily reduced to distress. A wealthy person, on the contrary, always escapes imprisonment. . . . Nothing can be more aristocratic than this system of legislation. (De Tocqueville, Democracy in America (Dover Thrift ed. 2017) p. 56.) Tocqueville attributed this anomaly to English law which he thought Americans retained despite the fact that it was "repugnant to the general tenor of their legislation and the mass of their ideas." (*Ibid*.)

_____
Kline, P.J.

We concur:


_____
Stewart, J.


_____
Miller, J.

*In re Humphrey on Habeas Corpus* (A152056)

47

Trial Judge:                    Hon. Joseph M. Quinn

Trial Court:                  San Francisco County Superior Court


Attorneys for Petitioner:      Civil Rights Corps
Alec Karakatsanis

Jeff Adachi,
San Francisco Public Defender

Matt Gonzalez
Chief Attorney

Paul Myslin
Deputy Public Defender


Attorneys for Respondent:     Attorney General of California
Xavier Becerra

Gerald A. Engler
Chief Assistant Attorney General

Jeffrey M. Laurence
Senior Assistant Attorney General

Seth K. Schalit
Supervising Deputy Attorney General

Katie L. Stowe
Deputy Attorney General