Filed 9/8/22  P. v. Zepeda-Onofre CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>AUGUSTIN ZEPEDA-ONOFRE,<br><br>    Defendant and Appellant. | A162223<br><br>(Sonoma County Super. Ct.<br> No. SCR6095252) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>SIDONIO CRUZ-SANTOS,<br><br>    Defendant and Appellant. | A162241<br><br>(Sonoma County Super Ct.<br> No. SCR6095251)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN JUDGMENT]** |

**BY THE COURT:**

It is ordered that the opinion filed herein on August 12, 2022, be modified as follows:

1.  On page 4, first full paragraph, line 7, delete portion of sentence ending with "shot Gabino" and replace it with "the actual killer" so the sentence reads:

> The court rejected the prosecutor's first theory, finding that the evidence did not support a finding that either of the defendants was the actual killer.

1

2. On page 4, first sentence of last partial paragraph is changed to read:

The trial court's decision that defendants were direct aiders and abettors but not the actual killers required it to find that a third party perpetrator,[6]

3. On page 4, in the sentence above, footnote 6 is added after the word "perpetrator." Add as footnote 6 the following footnote, which will require renumbering of all subsequent footnotes:

[6] The California Supreme Court has repeatedly stated that because jurors are not required to agree unanimously on the theory by which a defendant is guilty of murder, " ' "the jury need not decide unanimously whether defendant was guilty as the aider and abettor or as the direct perpetrator." ' " (*People v. Smith* (2014) 60 Cal.4th 603, 618.) " ' "Sometimes . . . the jury simply cannot decide beyond a reasonable doubt exactly who did what. There may be a reasonable doubt that the defendant was the direct perpetrator, and a similar doubt that he was the aider and abettor, but no such doubt that he was one or the other." (*People v. Santamaria* (1994) 8 Cal.4th 903, 918–919; see also *People v. Beardslee* (1991) 51 Cal.3d 68, 92.)' " (*Ibid*.) In the present case, the trial court's finding that neither defendant was the actual killer makes this rule inapplicable, and, to be guilty as aiders and
abettors, the defendants had to have aided and abetted someone.

4. On page 19, first full paragraph under the heading "A. First Element: Identifying the Perpetrator," delete the last sentence beginning with "On the basis . . . ."

5. On page 20, last partial paragraph, delete the entire paragraph beginning with "Cooper was decided . . ." and replace the deleted paragraph with the following paragraph:

Like the trial court in *Cooper,* the trial court in this case was called upon to make factual findings based on the same evidence which had been presented to the jury. But, unlike *Cooper,* where the court's findings that Cooper possessed or fired

a gun in connection with the kidnapping were inconsistent with the jury's acquittal of Cooper on firearm charges, here the trial court's conclusion that the prosecution had not proven beyond a reasonable doubt that "defendants were the actual killers" is consistent with the jury's finding that neither defendant intentionally discharged his firearm in a manner causing injury or death. But if *neither* defendant was the actual killer, neither can be found guilty on the basis of having aided and abetted the other. We therefore turn to a review of the record for evidence that the defendants directly aided and abetted a third party perpetrator who fired the fatal shot[s].[11]

6. On page 20, at the end of the paragraph added above, add as footnote 11 the following footnote, which will require renumbering of all subsequent footnotes:

[11] To reiterate (see fn. 6, *ante*), we do not mean to suggest that it is *always* necessary to identify whether a defendant was a direct perpetrator or an aider and abettor. (See *People v. Smith*, *supra*, 60 Cal.4th at p. 618.) Given the trial court's finding that neither defendant was the actual killer, this is not a situation in which it can be said that " ' "[t]here may be a reasonable doubt that the defendant was the direct perpetrator, and a similar doubt that he was the aider and abettor, but no such doubt that he was one or the other." [Citations].)' " (*Ibid*.)

7. On page 21, last partial paragraph, change the beginning of the first sentence so that it reads:

Because the trial court found the evidence precluded finding the defendants were the shooters,

Respondent's petition for rehearing is denied.

Since this court's August 12, 2022 opinion does not meet the standard for publication as set forth in rule 8.1105(c) of the California Rules of Court, the requests for publication are denied.

3

Pursuant to rule 8.1120(b) of the California Rules of Court, the Clerk is directed to forward to the Clerk of the Supreme Court the request for publication, the opinion, and a copy of this order.

There is no change in the judgment.


Dated: _____                      _____

                                                Richman, Acting P.J.

Filed 8/12/22  P. v. Zepeda-Onofre CA1/2 (unmodified opinion)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>AUGUSTIN ZEPEDA-ONOFRE,<br><br>    Defendant and Appellant. | A162223<br><br>(Sonoma County Super. Ct. No. SCR6095252) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>SIDONIO CRUZ-SANTOS,<br><br>    Defendant and Appellant. | A162241<br><br>(Sonoma County Super Ct. No. SCR6095251) |

On October 15, 2011, Gabino Santiago Lopez[1] and his roommate, Conrado Valentin Cruz, joined Ramon Lopez Velasco, Augustin Zepeda-Onofre, and Sidonio Cruz-Santos in a marijuana garden outside of Healdsburg, California to celebrate the end of the work week by eating, drinking beer, and snorting cocaine. Augustin and Sidonio were armed with

---

[1] We follow the parties' convention of referring to the six people who were present in the marijuana garden on the day of the murder by their first names. We mean no disrespect by this informality.

1

handguns. Several hours later, Gabino was dead from gunshot wounds inflicted by one of the men present at the celebration, using one or more firearms that were never recovered. Sidonio and Augustin (collectively, defendants) were charged with Gabino's murder.

Defendants' trial took place in 2013. The trial court instructed the jury on three separate theories of murder: (1) that defendants were direct perpetrators of first degree or second degree murder; (2) that defendants directly aided and abetted the murder; and (3) that the murder was a natural and probable consequence of the defendants' illegal cultivation of marijuana, assault with a firearm, or brandishing a firearm. The jury convicted defendants of second degree murder, cultivation of marijuana, and three counts of assault with a firearm. The jury found that the defendants were armed at the time of the murder, but rejected special allegations that the defendants intentionally discharged their firearms, or discharged their firearms in a manner causing great bodily injury or death (§§ 12022.53, subd. (c),(d)), suggesting that the jury did not believe that either defendant was the actual perpetrator. This court affirmed the defendants' convictions. (*People v. Cruz-Santos and Zepeda-Onofre* (Nov. 18, 2015, A139860) [nonpub. opn.].)

In 2019, defendants filed petitions for resentencing under former Penal Code[2] section 1170.95.[3] Section 1170.95 "was enacted as part of Senate Bill

---

[2] All undesignated statutory references are to the Penal Code.

[3] While the appeal was pending, the Legislature amended section 1170.95 twice. Effective January 1, 2022, section 1170.95 was amended to clarify the procedures the Legislature intended trial courts to follow when considering petitions for resentencing. (Sen. Bill No. 775 (2020–2021 Reg. Sess.).) The amended provisions apply retroactively to all appeals that were

2

No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437), which altered liability for murder under the theories of felony murder and natural and probable consequences. Under section 1170.95, eligible defendants may petition to have their murder convictions vacated and be resentenced." (*People v. Cooper* (2022) 77 Cal.App.5th 393, 398 (*Cooper*).) "Senate Bill 1437 'amend[ed] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch.1015, § 1, subd. (f).)" (*People v. Gentile* (2020) 10 Cal.5th 830, 842 (*Gentile*).)

In their petitions for resentencing, defendants alleged that they had been convicted of second degree murder under the natural and probable consequences doctrine and were entitled to have their convictions vacated because they were "not the actual killer[s]." The trial court found that the petitions presented a prima facie case for relief.[4] It appointed counsel to

not final as of January 1, 2022. (*People v. Porter* (2022) 73 Cal.App.5th 644, 652.)

Section 1170.95 was renumbered section 1172.6 effective June 30, 2022. (Stats. 2022, ch. 58, § 10.) Section 1172.6 authorizes defendants who have been convicted of murder, attempted murder or manslaughter under the felony murder or natural and probable consequences doctrine to petition for resentencing. Because defendants' petitions for resentencing were filed in 2019 under former section 1170.95, and because the statutory amendments do not affect the outcome of this appeal, we refer to section 1170.95 in this opinion despite the fact that the statute has been renumbered.

[4] The jury likely convicted defendants of murder based on the natural and probable consequences doctrine. (*People v. Cruz Santos and Zepeda Onofre*, *supra*, A139860.) In her closing argument, the prosecutor stated that if the jury was not convinced that one or both of the defendants had fired the

represent the defendants, issued an order to show cause to the People, and set an evidentiary hearing.

At the hearing, the parties did not submit any "new or additional evidence" as authorized by section 1170.95, subdivision (d)(3). Instead, in reliance on the trial transcripts[5] and our appellate opinion, the prosecutor argued that there were two legal theories upon which the convictions could be sustained: first, that one or both defendants were direct perpetrators of Gabino's murder; or second, that defendants directly aided and abetted the murder. The court rejected the prosecutor's first theory, finding that the evidence did not support a finding that either of the defendants shot Gabino. The court found that the prosecutor had proven beyond a reasonable doubt that defendants directly aided and abetted the murder, and on this basis (but without further explanation) denied the petitions. These consolidated appeals followed.

The decision that defendants were direct aiders and abettors required the trial court to find that a third party perpetrator, who harbored express or implied malice, lethally shot Gabino; and that each defendant, while aware of and sharing the perpetrator's intent, or while acting in conscious disregard for human life, aided the perpetrator in the commission of the murder. (*Gentile*, *supra*, 10 Cal.5th at p. 843.) Because our exhaustive review of the

---

shots that killed Gabino, they could nevertheless find defendants guilty of second degree murder on the theory that the shooting was a natural and probable consequence of defendants conspiring to illegally cultivate marijuana. The jury convicted defendants of second degree murder despite finding that neither had discharged his weapon in connection with the murder.

[5] We granted Sidonio's unopposed request to take judicial notice of the trial court record in the initial appeal (A139860). Our factual summary is drawn from the trial court record in case No. A139860.

4

trial court record has failed to reveal evidence that supports these mandatory elements of direct aider and abettor liability, we reverse.

## Factual and Procedural Background

### I. 2013 Jury Trial

On October 11, 2011, Ramon asked Conrado to help him find extra work. Conrado introduced Ramon to Sidonio, who hired Ramon to work as a laborer in a marijuana garden located on Chemise Road outside of Healdsburg. Ramon worked alongside Augustin for four days, cultivating marijuana plants, building sheds, and transporting dried marijuana from another marijuana garden to the Chemise Road site.

Sidonio and Augustin "were armed with both handguns and long guns" at the work site. At Sidonio's direction, Augustin obtained a handgun for Ramon and showed him how to load it. Sidonio told Ramon "to carry that gun with me in case of an emergency. If something were to happen during the nighttime because . . . there are wild animals and there are people whose objective is to steal the harvest."

On Saturday, October 15, 2011, Sidonio, Augustin, and Ramon worked at the Chemise Road site building a shed and trimming marijuana plants. As usual, Sidonio and Augustin were armed.

Ramon's brother-in-law, Gabino,[6] Conrado, and a man named Angel arrived later that afternoon "to celebrate Ramon's last day working on Chemise Road." Everyone but Ramon started drinking beer. Later that afternoon, Ramon drove Sidonio's gray Jetta to Healdsburg to drop off Angel and pick up food. When he returned, Ramon saw Sidonio, Augustin, and Conrado snorting cocaine. Around 7:00 p.m., Sidonio became irritated when

---

[6] Conrado and his wife shared a home with Gabino and his wife. Gabino was married to Ramon's sister.

5

he heard people riding an all-terrain vehicle nearby; he ordered Augustin "to shoot the gun" "to frighten those assholes . . . so that they would leave" "and stay way [*sic*] from the place." Augustin obeyed, firing a single shot into the air.

At some point, Conrado and Gabino began arguing. Conrado accused Gabino of telling his wife that he used cocaine. Ramon intervened; the argument ceased after a couple of minutes, then resumed. Conrado continued to complain about Gabino informing on him, and the two men eventually began to grab at each other's clothing. Things became so heated that Sidonio drew his gun and told Conrado to leave: "If you have problems in your house then go fix them in your house. But don't come here and give me problems. Because the devil is touching me and I can be capable of anything."

Ramon urged Conrado to leave. When Conrado started to walk the wrong way, Sidonio blocked him with his gun in his hand, "telling him that was the wrong way to take." Ramon—who described himself as "the only person . . . there in his five senses"—led Conrado and Gabino out of the marijuana garden and towards the driveway off the property. Conrado and Gabino were so "drunk they [had] a difficult time walking properly." Sidonio and Augustin, who were "not totally" intoxicated, followed.

When Ramon, Conrado, and Gabino reached the driveway, Conrado told Ramon "that he was very drunk . . . that he wasn't able to drive. He gave me his keys in order to go get his truck from where it had been . . . parked." As Ramon began walking towards the shop to retrieve Conrado's black pick-up truck, he heard Sidonio and Augustin "walking towards the driveway where we were standing." About two minutes later, Ramon heard three or four gunshots; he "got scared," but continued to walk towards the shop.

6

Ramon explained what happened next: "When I came back with the truck . . . I was able to see that . . . Sidonio had Conrado on the ground with the gun to his head." "I stopped the truck as fast as I could, and I ran towards where Sidonio was, grabbing Conrado." "When I was getting closer to them, I could listen to what he was saying, not to say anything of what Conrado had seen, because he was capable of finding him or his family and kill[ing] them." Ramon pushed Sidonio off Conrado. Sidonio then "put the gun twice, one in the head and on my chest." Ramon asked Sidonio "where Gabino was." Sidonio replied "Gabino had gone to hell." When Ramon asked why, Sidonio answered: "Just because I want to." Spotting "a lot of blood" on the driveway, Ramon asked again "where Gabino was," and Sidonio told Augustin to "show [him] where Gabino was."

Augustin appeared with a gun in his hand—"the same gun that they [*sic*] were carrying that same day." "With his right hand he was holding the gun, and with his left hand he was indicating where he wanted me to walk to." After walking a short distance, Augustin told Ramon to "look down." "It was Gabino's body." "A little time after that Sidonio with weapon in hand ordered Conrado that he help me get the body out of there." Sidonio actually said: "Get that garbage out of there . . . to tear him apart or to bury him, but he didn't want to know anything of what had happened. And if I said something or if I whispered something, that he was going to find me here or in Mexico and my family to do the same to me." When Ramon asked again "why he had done it," Sidonio repeated: "Just because he wanted it."

While Sidonio and Augustin "were pointing at me with the gun," Ramon and Conrado managed to get Gabino's body into the bed of Conrado's pick-up truck. Conrado refused to get into the truck with Ramon and walked over to Sidonio and Augustin. "When I realized that [Conrado] didn't want to

7

get in the truck I ran towards the driver's seat . . . to get out of there as fast . . . as I could." Ramon drove for about an hour, dumped Gabino's body by the road, and then notified Healdsburg police.

Ramon initially told officers at the Healdsburg Police Department that he thought his brother-in-law Gabino had been killed, and that Conrado might also be dead. Officers immediately went to Conrado's home, where they found him unhurt but "very nervous." Conrado voluntarily went with the officers to a police station to answer questions.

Ramon led other officers to the Chemise Road property, where he pointed out the marijuana garden and the bloodstains on the driveway. About 5:00 a.m., the officers encountered Augustin driving a white pick-up truck down the driveway. Augustin had blood on his pants leg, and a wet substance on his boot that was later determined to be blood. Although it was still dark, and although he was out of sight in the back of a police vehicle, Ramon was described as "terrified" while he identified Augustin.

At 6:50 a.m., Sidonio's gray Jetta drove down the driveway and stopped near the officers. A man Ramon did not recognize got out. Bulmaro Perez Hernandez testified that he had located Sidonio sleeping in a Jeep Liberty near the shop at 6:30 a.m. and obtained his permission to drive the Jetta. Blood splatter marks were visible on the vehicle's trunk, as well as "smear marks where it looked like somebody had wiped it up." Law enforcement apprehended Sidonio a few minutes later, still asleep in the Jeep Liberty near the shop. When officers brought Sidonio to the driveway, Ramon was "trying to . . . duck down and make himself not visible when Sidonio was around."

Ramon's trial testimony differed in several material respects from the initial statements he gave to law enforcement. For example, Ramon testified

8

at trial that the only people who handled firearms in the marijuana garden on October 15 were Sidonio and Augustin. He denied hearing Conrado ask anyone about a gun that night. However, during his initial interview with Deputy Hanshew on October 16, 2011, Ramon said that Conrado approached Sidonio about buying a gun "for a problem he was having with pigs on another property that he worked." Additionally, Ramon initially told Deputy Hanshew in October 2011 that when he drove Conrado's truck back to the driveway after hearing shots fired, Sidonio and Conrado were arguing about who was "better" or tougher. It was not until six months later, during a follow-up interview on February 8, 2012, that Ramon told Hanshew that Sidonio had Conrado on the ground and was threatening him with a gun. Finally, Ramon initially told law enforcement that Augustin and another man had followed him when he left Chemise Road to dispose of Gabino's body, and that Augustin had directed him where to dump the body. Ramon later admitted that he had lied about Augustin following him.

Ramon testified about the plea deal he had negotiated with the People prior to testifying. In exchange for his promise to "[c]ooperate, help or tell the truth in this case," the murder charge was dismissed and Ramon was allowed to plead guilty to a misdemeanor accessory after the fact to cultivation of marijuana with credit for time served. Ramon also believed that the Sonoma County District Attorney's Office would assist him and his family with immigration issues pursuant to the plea deal.

The prosecutor presented evidence regarding the crime scene investigation. Deputies found three bags of dried marijuana and considerable amounts of dried or drying marijuana on the Chemise Road property. They found a .243 caliber lever action rifle hidden underneath leaves, and various types of ammunition in the marijuana garden. A

9

prosecution expert, Detective Brandon Van Camp, testified that the cultivation on Chemise Road was an illegal, non-medicinal, commercial operation, designed to evade aerial detection. Van Camp testified that, in his experience, firearms were commonly associated with illegal marijuana operations: "Well, definitely of all the outdoor marijuana grows that I have been in and certainly most of the training that I've been to, there are definitely firearms . . . involved with outdoor marijuana gardens." There are "multiple reasons" for the connection: "One is to protect and defend the garden from intruders. Two is to protect it from wildlife" such as deer and rats.

Law enforcement found "dry blood in the bed portion of [Conrado's] pickup truck, and . . . also saw drag marks which looked like whatever was in the back of the truck was dragged toward the tailgate end . . . of the pickup truck." The blood observed on Sidonio's Jetta was determined to be Gabino's. The blood on Augustin's jeans and boot was consistent with two contributors, Augustin and Gabino.

A crime scene investigator found two .22 caliber bullets in the center console of Conrado's pick-up truck. Bulmaro testified that he removed four or five bullets from the center console of Sidonio's Jetta and put them in his pocket before being stopped by law enforcement. Law enforcement did not locate any firearms or ammunition in any of the vehicles associated with the crime scene: Sidonio's Jetta, the Jeep Liberty where Sidonio was found sleeping, or Augustin's white pick-up truck.

Deputies swabbed the defendants' hands for gunshot residue (GSR). No evidence was introduced at trial as to whether the defendants had GSR on

10

their hands.[7]  The criminalist found 5 GSR particles in a sample taken from Augustin's sweatshirt, but concluded that "they could have come from some other environmental source."  Deputies did not test Conrado's clothes for blood or GSR because law enforcement considered Conrado a witness, not a suspect.

The forensic pathologist testified that Gabino was shot twice—once in the face and once in the chest—and that either shot would have been fatal. She could not determine the caliber of the bullets that killed Gabino, but did not think they came from a rifle.  No fingerprints were recovered from the rifle or ammunition found at the scene.

As we have explained, the jury was instructed that the defendants could be found guilty of murder if any of the following were proven true beyond a reasonable doubt:  (1) that defendants were direct perpetrators of first degree or second degree murder, (2) that the defendants directly aided and abetted second degree murder, or (3) the murder was a natural and probable consequence of the defendants' target crimes or defendants' participation in an uncharged conspiracy to illegally cultivate marijuana. The jury rejected charges of first degree murder and convicted both defendants of second degree murder.  The jury found that defendants were armed in connection with the murder (§§ 12022.53, subd. (b) & 12022, subd. (a)(1)).  Defendants were acquitted of intentionally discharging their firearms (§ 12022.53, subd. (c)) and discharging their firearms in a manner that caused death or great bodily injury.  (§ 12022.53, subd. (d).)

---

[7] The swabs used to take GSR samples from the defendants' hands were "the old method of collection" and therefore "were not samples that [the criminalist from the Department of Justice] could currently analyze."

11

The jury also convicted defendants of cultivation of marijuana while armed (Health & Saf. Code, § 11358, Pen. Code, § 12022, subd. (a)(1)), and three counts each of assault with a firearm on victims Ramon, Conrado and Gabino (§§ 245, subd. (a)(2), 12022.5, subd. (a)(1). In addition, Sidonio was found guilty of furnishing a firearm to enable the cultivation of marijuana (§ 12022.4), and dissuading a witness (§ 136.1, subd. (c)) while armed with a firearm (§ 12022.4).

## II. Hearing on Petitions For Resentencing

The prosecutor offered the trial transcripts, the jury instructions and verdict forms, and this court's 2015 opinion at the resentencing hearing to sustain its burden of proving beyond a reasonable doubt "that the petitioner[s] [are] guilty of murder . . . under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (d)(3).) She argued that "there is no doubt, no reasonable doubt, that each defendant is guilty either as a direct perpetrator of this killing or as a direct aider and abettor." "No one else was armed at the time of the killing, indeed throughout the hours preceding the killing. The actual killer, meaning the shooter, is either Sidonio or Augustin or both."

Counsel for Sidonio argued that the defendants' murder convictions must be vacated because "[t]he court does not know what happened in the immediate moments preceding the murder. The court does not know who shot. The court does not know who is the actual killer." Defense counsel emphasized that the court must find "[m]alice . . . with respect to the act of killing. There is no evidence whatsoever of express malice as to [Sidonio] forming express malice in desiring to kill Gabino." "Implied malice requires a pact wherein [Sidonio] would know his act was likely to cause death and . . . showed conscious disregard for life." Counsel for Augustin joined in these

12

arguments. He characterized the prosecutor's inferences as "tenuous," noting that inferences drawn from circumstantial evidence must be proven beyond a reasonable doubt.

On March 21, 2021, the trial court[8] orally announced its decision to deny the petitions for resentencing. The decision demonstrates that the court understood its duty as an independent trier of fact to consider the evidence presented and determine if the prosecution had proven the defendants' guilt beyond a reasonable doubt based on a then-viable theory of murder. (§ 1170.95, subd. (d)(3); *People v. Clements* (2022) 75 Cal.App.5th 276, 297 (*Clements*).)

"In evaluating the evidence, I am not going to recite all the facts in this case yet again. It is argued throughout this hearing and the record is crystal clear as to the facts. The prosecution has argued there are still two viable theories for murder. Number one, the defendants are both direct aiders and abettors. And number two, the defendant was an actual killer. I do not believe the evidence supports beyond a reasonable doubt that the defendants were the actual killers. To be clear for the record, I do believe there is substantial evidence, but that's not the burden I'm using; however, I do believe the prosecution has met their burden beyond a reasonable doubt both defendants are direct aiders and abettors and, therefore, the petition is denied. That's my ruling."

---

[8] Section 1170.95, subdivision (b)(1), expresses a preference that the petition be heard by "the judge that originally sentenced the petitioner." However, "[i]f the judge that originally sentenced the petitioner is not available to resentence the petitioner, the presiding judge shall designate another judge to rule on the petition." In this case, the judge who heard defendants' petitions for resentencing was not the judge who had presided over defendants' 2013 jury trial.

## DISCUSSION

## I. General Legal Principles

## A. Conduct of Hearing on Petition for Resentencing

"Senate Bill 1437 transformed the law of accomplice liability for murder by ' "amend[ing] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder . . . .' " [Citation.]" (*People v. Langi* (2022) 73 Cal.App.5th 972, 978.) "At the hearing stage, 'the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing.' ([§ 1170.95, subd. (d)(3)].)" (*People v. Lewis* (2021) 11 Cal.5th 952, 960; see also *Clements, supra*, 75 Cal.App.5th at p. 297.)

"Of course, in a section 1170.95 petition, the trial judge isn't charged with holding a whole new trial on all of the elements of murder. Instead, the parties will focus on evidence made relevant by the amendments to the substantive definition of murder." (*Clements, supra*, 75 Cal.App.5th at p. 298.) "[T]he court may consider evidence previously admitted at any prior hearing or the trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion." [9] (§ 1170.95, subd. (d)(3).)

---

[9] "[T]he Legislature has decided trial judges should not rely on the factual summaries contained in prior appellate decisions when a section 1170.95 petition reaches the stage of a full-fledged evidentiary hearing." (*Clements, supra*, 75 Cal.App.5th at p. 292.) Here, although the trial court took judicial notice of our prior opinion, defendants have not identified any impropriety, nor have they argued that the trial court's ruling was improperly based on the opinion rather than evidence drawn from the trial transcripts. (See, e.g., *Clements*, at pp. 292–293.)

14

**B. Standard of Review Upon Denial of Petition For Resentencing**

"[I]n determining whether a trial court correctly denied a section 1170.95 petition after an evidentiary hearing, ' " 'we review the factual findings for substantial evidence and the application of those facts to the statute de novo.' " ' " (*Cooper, supra,* 77 Cal.App.5th at p. 412.) "We ' "examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt.' " [Citation.] Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." (*Clements, supra,* 75 Cal.App.5th at p. 298.)

"Nevertheless, we do not defer to the trial court's decision entirely. [Citation.] 'Substantial evidence is a deferential standard but it is not toothless.' [Citation.] 'We may not uphold a finding based on inherently improbable evidence or evidence that is irrelevant to the issues before us.' [Citations.]" (*Lee v. Amazon.com, Inc.* (2022) 76 Cal.App.5th 200, 222.) " ' " 'Furthermore, '[w]hile substantial evidence may consist of inferences, such inferences must be a 'product of logic and reason' and 'must rest on the evidence' [citation]; *inferences that are the result of mere speculation or conjecture cannot support a finding* [citations]." [Citation.] "The ultimate test is whether it is reasonable for a trier of fact to make the ruling in

15

question in light of the whole record." [Citation.]' [Citation.]" '" (*In re J.A.* (2020) 47 Cal.App.5th 1036, 1046.)

## C. Elements of Aiding and Abetting Second Degree Murder

"[S]econd degree murder . . . is 'the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.' [Citation.] Malice may be either express (as when a defendant manifests a deliberate intention to take away the life of a fellow creature) or implied. [Citation.] 'Malice is implied when the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " [Citation.]' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507; see CALCRIM No. 520.)

"A person who aids and abets the commission of a crime is culpable as a principal in that crime." (*Gentile, supra,* 10 Cal.5th at p. 843.) An aider and abettor's guilt "is based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117; *People v. Powell* (2021) 63 Cal.App.5th 689, 712–713.) "Thus, proof of aider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime." (*People v. Perez* (2005) 35 Cal.4th 1219, 1225; *McCoy*, at p. 1117.) "It is settled that if a defendant's liability for an offense is predicated upon the theory that he or

16

she aided and abetted the perpetrator, the defendant's intent to encourage or facilitate the actions of the perpetrator 'must be formed *prior to or during* "commission" of that offense.' [Citation]." (*People v. Montoya* (1994) 7 Cal.4th 1027, 1039.) "[I]n general, neither presence at the scene of a crime nor knowledge of, but failure to prevent it, is sufficient to establish aiding and abetting its commission." (*People v. Durham* (1969) 70 Cal.2d 171, 181.) Whether a defendant is a direct aider and abettor is a question of fact, and all reasonable inferences must be resolved in favor of the judgment. (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409.)

"[A]n aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life." (*Gentile, supra*, 10 Cal.5th at p. 850.) Unlike the natural and probable consequences doctrine, the implied malice theory of murder "requires that the prosecution demonstrate the defendant in fact acted with malice." (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 106.) "Current law thus provides that the actual killer, or a direct aider and abettor of the killing who knew that his (or her) conduct endangered the life of another and acted with conscious disregard for life, may be guilty of second degree murder." (*People v. Langi, supra,* 73 Cal.App.5th at p. 979; *People v. Powell, supra,* 63 Cal.App.5th at pp. 712–714.)

Pursuant to Senate Bill 1437, the amendment of section 188, subd. (a)(3) "bars a conviction for second degree murder under the natural and probable consequences theory" (*Gentile, supra,* 10 Cal.5th at p. 838), but the statute "did not . . . alter the law regarding the criminal liability of direct aiders and abettors of murder." (*People v. Offley* (2020) 48 Cal.App.5th 588, 595.)

17

## II. No Procedural Error at Hearing

Defendants make a single claim of procedural impropriety regarding the conduct of the hearing on their petitions for resentencing. They contend that the trial court "erred in failing to give a statement of reasons regarding what facts it believed established aiding and abetting, regarding whether it found malice, and regarding what facts, if any, established malice; in failing to do so, it denied [defendants] the opportunity for a fair appeal."

We reject defendants' claim of error for three reasons. First, the plain language of section 1170.95 does not require a trial court to prepare an oral or written statement of reasons when ruling on the merits of a petition for resentencing. Second, neither defendant objected when the trial court orally announced its decision on the petitions and the issue is thus waived. (*People v. Scott* (1994) 9 Cal.4th 331, 348, 351.) Third, the trial court's oral ruling here is sufficient to permit appellate review.

Although a statement of reasons is not mandated when denying a petition for resentencing, we observe that "[e]xplicit judicial findings 'serve several worthy purposes: They help assure a realistic review by providing a method of evaluating a judge's decision or order; they guard against careless decision making by encouraging the trial judge to express the grounds for his decision; and they preserve public confidence in the fairness of the judicial process.' " (*In re Humphrey* (2018) 19 Cal.App.5th 1006, 1038.) This is particularly true in section 1170.95 hearings, which, as in this case, often require a trial judge to "make factual determinations on a cold record." (*Clements, supra,* 75 Cal.App.5th at p. 297.)

We now turn to an examination of the trial court's decision that the defendants directly aided and abetted Gabino's murder.

18

### III. The Lack of Substantial Evidence to Support the Direct Aider and Abettor Theory Requires Reversal

#### A. First Element: Identifying the Perpetrator

The prosecutor argued at the hearing on defendants' petitions for resentencing that "[t]he actual killer, meaning the shooter, is either Sidonio or Augustin or both." On appeal, the Attorney General acknowledges that the prosecution theory was "that each defendant directly aided and abetted the other in murdering Gabino." Citing *Cooper*, counsel for Sidonio and Augustin assert that the prosecution theory is inconsistent with the jury's finding that neither defendant was the shooter. On the basis of the record presented at the resentencing hearing, we agree with defendants.

*Cooper* involved a defendant and two codefendants who participated in a kidnapping that resulted in the death of the victim. (*Cooper, supra*, 77 Cal.App.5th at p. 397.) An autopsy revealed that the victim died of a gunshot wound to the head (*id.* at p. 400), however, it was unclear which defendant had fired the fatal shot. "The jury convicted [Cooper] of one count of first-degree murder and one count of kidnapping and found true that a principal was armed with a firearm during both offenses. But Cooper—who was stipulated to be a convicted felon—was acquitted of a charge of being a felon in possession of a firearm." (*Id.* at p. 399, fn. omitted.) The trial court denied Cooper's section 1170.95 petition for resentencing, "finding beyond a reasonable doubt that Cooper was a major participant in the kidnapping who acted with reckless indifference to human life. In reaching this conclusion, the court made numerous statements to the effect that Cooper possessed and fired a gun on the day in question." (*Cooper*, at p. 408.) The appellate court reversed, holding "that a trial court cannot deny relief in a section 1170.95 proceeding based on findings that are inconsistent with a previous acquittal when no evidence other than that introduced at trial is presented." (*Id.* at

19

p. 398.) Based on the jury's finding that Cooper had not been in possession of a firearm at the time of the kidnapping, the appellate court found that "any evidence he possessed or used a gun should not have played a role in the [trial] court's analysis." (*Id*. at p. 412.)

Cooper was decided while this appeal was pending, and the parties submitted supplemental briefs regarding its application to this case. Defense counsel asserted that "the trial court should have been barred from making a finding" that either defendant aided and abetted the other because both defendants were acquitted of personal discharge of a firearm causing death under section 12022.53, subdivision (d). The Attorney General wrote that "it was unnecessary for the resentencing court to find that either defendant fired the fatal shot[s], and it did not do so." The parties appear to agree that because the jury's verdict eliminated Sidonio and Augustin as shooters, and no new evidence was presented at the hearing, *Cooper* required the trial court to base its decision on a theory which did not involve either defendant discharging a firearm. Accordingly, we review the record for evidence that the defendants directly aided and abetted a third party perpetrator who fired the fatal shot[s].

Defendants argued at trial and at the resentencing hearing that Conrado was the most likely perpetrator of Gabino's murder. At trial, the prosecution resisted defendants' attempts to point to Conrado as the shooter, successfully excluding evidence of Conrado's false statements to the police, as well as evidence that Conrado was unavailable at trial because he had fled to Mexico. (*People v. Cruz Santos and Zepeda Onofre*, *supra*, A139860.) On appeal, the Attorney General does not directly address the theory that Conrado shot Gabino, other than to say that the jury necessarily must have rejected this theory.

20

Because the evidence excludes the defendants as shooters, and because neither party asserts that Ramon—who testified that he was not present when Gabino was shot—was the perpetrator, we assume for the purpose of our analysis that Conrado was the direct perpetrator of the murder.[10] The evidence supports an inference that Conrado, Sidonio, and Augustin were present when Gabino was killed. Augustin had Gabino's blood on his pants and his boot. Sidonio threatened to harm Conrado if he spoke about "what he had seen," which supports an inference that Sidonio and Conrado were present and either witnessed or participated in the murder. Sidonio and Augustin were armed, which supports an inference that Conrado had access to a firearm at the time of the murder.

## B. Second Element: Intent

"Murder, whether in the first or second degree, requires malice aforethought. (§ 187.) Malice can be express or implied. It is express when there is a manifest intent to kill (§ 188, subd. (a)(1)); it is implied if someone kills with 'no considerable provocation . . . or when the circumstances attending the killing show an abandoned and malignant heart' (§ 188, subd. (a)(2)). When a person directly perpetrates a killing, it is the

---

[10] In declining to admit defense evidence of third party culpability, the judge who presided over the jury trial stated: "The court . . . has seen nothing in the record, not any statement, whether admissible or otherwise, that places a gun in Conrado's hand. There's no direct or circumstantial evidence that Conrado was the shooter." (*People v. Cruz Santos and Zepeda Onofre, supra*, A139860.) But the judge presiding over the section 1170.95 petition hearing, sitting as a trier of fact, was entitled to draw different conclusions than those drawn by the trial judge. (See *Clements, supra*, 75 Cal.App.5th at p. 297: "[I]t's unusual to ask the trial judge to sit as the fact finder and (in some cases) make factual determinations on a cold record, as the judge did in this case. While that is not the ideal position for a fact finder, it is possible to review a trial transcript and reach an opinion about what actually happened.")

21

perpetrator who must possess such malice. [Citations.] Similarly, when a person directly aids and abets a murder, the aider and abettor must possess malice aforethought." (*Gentile, supra,* 10 Cal.5th at p. 844.) An aider and abettor who does not expressly intend to aid a killing can be convicted of second degree murder if he acts with implied malice, that is, engages in conduct which he knows endangers the life of another and acts with conscious disregard for life. (*Gentile,* at p. 850.)

The record reveals no evidence to support the theory that Conrado, Sidonio, or Augustin acted with implied malice. "[T]he state of mind of a person who acts with conscious disregard for life is, 'I know that my conduct is dangerous to others, but I don't care if someone is hurt or killed.' " (*People v. Olivas* (1985) 172 Cal.App.3d 984, 988.) No evidence was presented at trial to explain the actions that Conrado, Sidonio, or Augustin took in connection with Gabino's murder. The prosecutor had the opportunity to present additional evidence at the section 1170.95 hearing, but chose not to augment the trial court record. The absence of evidence demonstrating that Conrado or the defendants deliberately performed acts that they knew endangered Gabino's life, with conscious disregard for life, necessarily requires us to reject the theory that defendants acted with implied malice.

We turn next to the question of whether the record supports a finding of express malice, that is, evidence that Conrado harbored a deliberate intent to kill Gabino, and that Sidonio and Augustin, aware of Conrado's criminal purpose, intended to commit or to encourage or facilitate the commission of the murder. (*People v. Beeman* (1984) 35 Cal.3d 547, 560.)

The evidence of Conrado's intent comes primarily from the prosecution's primary trial witness, Ramon, who testified that Conrado was frustrated that Gabino had disclosed Conrado's cocaine use to his wife.

22

Conrado got increasingly angry with Gabino as the evening wore on, leading Ramon to believe that a fistfight might break out. Ramon's testimony that Conrado initiated the argument with Gabino, knowing that Gabino had witnessed him using cocaine that very evening, permits a reasonable inference that Conrado may have been worried about the consequences if Gabino "snitched" on him again. It is unreasonably speculative, however, to infer from this evidence that Conrado intended to kill Gabino.

"[A]n aider and abettor will 'share' the perpetrator's specific intent when he or she knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." (*People v. Beeman, supra,* 35 Cal.3d at p. 560.) Here the record does not contain evidence which supports an inference that Conrado wanted to kill Gabino. We can locate no evidence which establishes that the defendants were aware that Conrado wanted to kill Gabino and intended to assist him. At trial and at the resentencing hearing, the prosecutor relied on the abundant evidence of Sidonio's animus towards Gabino to prove malice aforethought. However, Sidonio's callous statements fall short of proving that Sidonio and Augustin knew and shared "the murderous intent of the actual perpetrator." (*People v. McCoy*, *supra,* 25 Cal.4th at p. 1118.) Absent evidence of *Conrado's* intent to kill, and the defendants' knowledge of *Conrado's* intent, the trial court's decision that defendants were direct aiders and abettors of Gabino's murder cannot stand.

## C. Third Element: Conduct That Encouraged or Facilitated the Murder

In considering the third element, conduct by the aider and abettor that assisted, encouraged, or facilitated the commission of the crime, we are again faced with a lack of evidence in the record as to how the murder occurred. The prosecution has not identified any evidence that describes what acts, if

23

any, the defendants engaged in to assist, encourage, or facilitate Conrado's murder of Gabino. No witness saw the shooting, the murder weapon was never located, and the caliber of ammunition used to kill Gabino was never determined. While it is tempting to speculate about scenarios that could explain how the firearms Sidonio or Augustin were carrying could have been used to kill Gabino, speculation does not constitute substantial evidence to support convictions for second degree murder.

## DISPOSITION

The trial court's postjudgment order denying the defendants' petitions for resentencing is reversed. The matter is remanded for further proceedings consistent with this opinion.

_____

Mayfield, J.*


We concur:


_____

Richman, Acting P.J.


_____

Miller, J.


*People v. Zepeda-Onofre and Cruz-Santos* (A162223, A162241)


* Judge of the Mendocino Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


25